**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff**

v.

**HUGH GRIFFITH, Defendant**

Civil No. 632/1977

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

November 9, 1978

CLARICE A. BRYAN, ESQ., Professional Building, St. Thomas, V.I., *for plaintiff*

BRENDA J. HOLLAR, ESQ., Professional Building, St. Thomas, V.I., *for defendant*

FEUERZEIG, *Judge*

### MEMORANDUM OPINION

This is an action for debt and foreclosure of real property instituted by the Federal Deposit Insurance Corporation (hereinafter F.D.I.C.) as successor in interest to People's Bank. F.D.I.C. alleges that the defendant, Hugh Griffith, defaulted on a loan and seeks a judgment of foreclosure and an adjudication of personal liability of the defendant for any deficiency that may remain after a foreclosure sale. The defendant has counterclaimed alleging usury and that the bank breached an implied warranty of merchantability in selling him a repossessed automobile.

## I

Between 1970 and 1974 Hugh Griffith received four loans from two banks. The first loan in the amount of $1,756.32[1] was from the Bank of Nova Scotia (hereinafter Scotia) and was dated October 22, 1970 (hereinafter the Scotia loan). This loan was secured by a first priority mortgage on Parcel No. 48-5 Estate Frydenhoj, No. 3 Red Hook Quarter, St. Thomas, Virgin Islands, and was duly recorded.[2] The debt was paid in full on February 9, 1973,[3] but a release was not executed or recorded until November 9, 1977.[4] The succeeding three loans were given by F.D.I.C.'s predecessor, the People's Bank (hereinafter People's). It is not clear exactly when the first People's loan was given or for how much it was. The testimony revealed it was executed sometime in 1972 (hereinafter the 1972 loan), and was satisfied on February 26, 1973, when the defendant took out another loan (hereinafter the 1973 loan), in the amount of $4,674.00, exclusive of insurance and interest.[5] The 1973 loan was made so Mr. Griffith could purchase a repossessed automobile and pay off the 1972 loan. The 1973 loan was satisfied on June 24, 1974, when the defendant refinanced it by borrowing $3,691.00, exclusive of insurance or interest (hereinafter the 1974 loan).[6] Both the 1973 and the 1974

---

[1] The Memorandum of Deposit of Certificate of Title, Plaintiff's Exhibit 7, recites that the loan was for $2,000.00. The testimony revealed, however, that the practice of the bank was to "round off" to the next $250.00, and that the defendant's indebtedness was only $1,756.32. See the promissory note from Hugh Griffith to the Bank of Nova Scotia. Plaintiff's Exhibit 1.

[2] Plaintiff's Exhibit 7.

[3] See Plaintiff's Exhibit 1.

[4] Plaintiff's Exhibit 2.

[5] The disclosure statement, Plaintiff's Exhibit 3, reveals that, inclusive of interest and insurance, the total debt was $5,795.64.

[6] The disclosure statement, Plaintiff's Exhibit 6, reveals that, inclusive of interest and insurance, the total debt was $4,577.04.

loans bore interest at the rate of 12 percent per annum and were secured by duly recorded mortgage agreements on the same real property that secured the Scotia loan. The instruments were styled as "Collateral Mortgages."[7] No release was executed for the 1973 loan until November 18, 1977, more than three years after the satisfaction of the debt that it secured.[8] This action for foreclosure is premised on the defendant's default on the 1974 loan.

## II

The defendant argues that the loan was usurious. He concedes that pursuant to Act No. 3439, Sess. L. 1973, p. 118, a 12 percent rate of interest is legal in the Virgin Islands on all contracts other than first priority mortgage loans.[9] He argues, however, that the 1974 loan, despite its being labeled a collateral mortgage, was in reality a first priority mortgage loan for which no more than a 9 percent rate of interest was allowed. Because the Scotia loan and the 1973 loan were satisfied by the date of the 1974 loan, the defendant maintains that the 1974 loan assumed first priority status. Furthermore, defendant alleges that People's was aware of the satisfaction of the Scotia loan, notwithstanding the failure of Scotia bank to record a re-

---

[7] Plaintiff's Exhibits 8 and 10 respectively.

[8] Plaintiff's Exhibit 4.

[9] This Act, which suspended the operation of 11 V.I.C. § 951(b) for a period of one year, was in effect at the time of the 1974 loan, and provided:
"Notwithstanding the provisions of Title 11, section 951, subsection (b), Virgin Islands Code, an interest rate not exceeding twelve (12%) percent per annum may be charged on contracts by express agreement of the parties, except that on first priority mortgage loans on real estate the maximum legal rate shall be nine (9%) percent per annum. The provisions of this section shall be effective from the date this Act [June 26, 1973] shall become law through June 30, 1974, provided that any agreement executed pursuant to this section during said period may have continuing force and effect through June 30, 1974."

lease. He therefore urges that the sanctions of 11 V.I.C. § 953 and § 954 be applied.[10]

F.D.I.C. vigorously contests defendant's position. It denies knowledge of satisfaction of the Scotia loan in 1973, and asserts generally that it is entitled to rely on the records maintained by the Recorder of Deeds.

### PLAINTIFF'S CLAIM

■■ This case presents a unique and interesting clash of competing legal principles and social policies, each of which rightfully vies for recognition. On the one side there is the general principle that

payment of the mortgage indebtedness extinguishes the lien regardless of any formal entry to that effect on the record.

59 C.J.S. Mortgages § 470b (1949); American National Ins. Co. of Galveston, Texas v. Murray, 383 F.2d 81 (5th Cir. 1967); accord, Valley National Bank of Phoenix v. Milmoe, 74 Ariz. 290, 248 P.2d 740 (1952); Moore v. Benjamin, 228 Wis. 591, 28 N.W. 340 (1938); Shriver v. Sims, 127

---

[10] Sections 953 and 954 provide:

§ 953. Usury; borrower's right to collect double damage

If usurious interest, as defined by sections 951 and 952 of this title, shall be received or collected, the person or persons paying the same, or their legal representatives, may by an action brought within two years after such payment, receive from the person, firm, or corporation, having received the same, double the amount of the interest so received or collected.

§ 954. Forfeiture of interest

If it is ascertained in any action brought on any contract, that a rate of interest has been contracted for greater than is authorized by this chapter, whether directly or indirectly, in money, property, or other valuable thing, or that any gift or donation of money, property, or other valuable thing has been made or promised to be made to a lender or creditor, or to any person for him, the design of which is to obtain for money loaned or for debts due or to become due, a rate of interest greater than that specified by the provisions of this chapter, the same shall be usurious and shall work a *forfeiture of the entire interest on the debt.* The court before which such action is prosecuted shall render judgment for the amount due on the sum loaned or the debt contracted, without interest, against the defendant, and for the costs of the action, against the plaintiff, whether such action is contested or not. (Emphasis added.)

Neb. 374, 255 N.W. 60 (1934); German-American Ins. Co. v. Humphrey, 62 Ark. 348, 35 S.W. 428 (1896).

On the other hand there

is the policy of the law . . . that all transactions affecting the title to real property shall be matters of record . . . to the end that those concerned may then ascertain the condition of such title by an examination of the public records . . . wherein such real property is located.

Fraser v. Clark, 128 Mont. 160, 273 P.2d 105, 115 (1954).

Consequently, the court must ask whether the policy in favor of recording is applicable to releases of mortgages. Assuming that it is, the question then is whether the Scotia mortgage was extinguished on February 8, 1973, the date of satisfaction of the Scotia loan, notwithstanding the failure to record. If so, then both the 1973 and the 1974 loans were secured by what in law were first priority mortgages and thus the rates of interest charged were usurious. If not, and the mortgage was a valid and effective encumbrance upon which People's could rightfully rely, notwithstanding the discharge of the debt, then the 1973 and 1974 loans were not usurious.

█ The inquiry begins with Royal Bank of Canada v. Clarke, 10 V.I. 415, 373 F.Supp. 599 (D.V.I. 1974). In that case the Royal Bank was the second mortgagee of certain real property. Its mortgage, however, was recorded some 18 months before the first mortgage was recorded. The issue presented was whether 28 V.I.C. § 124, relating to the effect of unrecorded conveyances, was applicable to mortgages.[11] By its terms the section applies only to a

---

[11] § 124. Unrecorded conveyance void as to subsequent innocent purchaser
Every conveyance of real property hereafter made within the Virgin Islands which is not filed for record shall be void against any subsequent innocent purchaser in good faith and for a valuable consideration of the same real property, or any portion thereof, whose conveyance is first duly recorded.

357

"conveyance." As Judge Young noted, the reference to a "subsequent innocent purchaser" is not an apt description of a subsequent mortgagee nor is the provision voiding, rather than subordinating, an unrecorded conveyance rationale when applied to subsequent mortgages. Nonetheless, in an excellent analysis, Judge Young concluded that 28 V.I.C. § 124 was applicable to mortgages. First, the court found that the definition of a conveyance included a mortgage. 28 V.I.C. § 1.[12] Second, the court concluded that there was a strong public policy in favor of "commercial freedom in land transactions," 10 V.I. at 419, 373 F.Supp. at 601, which only could be effectuated by recording. The court further held that Title 28 V.I.C. § 124

is intended to allow a prospective buyer of land to determine with assurance the condition of title, and thus to facilitate the sale of land. To attach no priority to recorded mortgages as against unrecorded mortgages would frustrate this policy, because a prospective buyer could never be certain that unrecorded mortgages might not affect title. In addition, it seems likely that the legislature sought to facilitate loans secured by land, as well as the sale of land, since the same basic policy of flexible land ownership would be involved.

10 V.I. at 418, 373 F.Supp. at 601. The court, therefore, felt compelled to give more weight to the intention of the Legislature than to the inartfully drafted and unduly restrictive language of section § 124, with the caveat that the section

must be construed as imposing appropriate sanctions on nonrecording mortgagees. *Thus an unrecorded mortgage prior in time to a recorded mortgage will not be "voided" thereby, but merely subordinated in the priority of its lien.* (Emphasis added.)

10 V.I. at 419–20, 373 F.Supp. at 602. This court, following the example of Royal Bank, supra, concludes that a re-

---

[12] 28 V.I.C. § 1 in pertinent part provides that a
"conveyance" includes every instrument in writing except a last will and testament, whatever may be its form and by whatever name it may be known in law, by which any estate or interest in lands is created, aliened, assigned, or *surrendered.* (Emphasis added.)

lease or discharge of a mortgage is a "conveyance" under 28 V.I.C. § 1, and that unrecorded discharges are void as against subsequent innocent purchasers. The same basic policy in favor of commercial freedom in land transactions, such that anyone can easily determine with assurance the present condition of title, applies with equal force to the recording of releases. Accordingly, the court finds that Virgin Islands public policy is strongly in favor of recording releases of mortgages as well as other conveyances.

■ However, where the subsequent mortgagee has actual notice of the satisfaction of the prior debt, he may not rely on the failure to record a release as grounds for fixing the higher rate of interest allowed for collateral mortgages.[12a] Under these facts a subsequent mortgagee should not be said to be analogous with a "subsequent innocent purchaser." Because the court finds that People's did in fact know that the Scotia loan was discharged at the time of writing the 1974 loan, the imposition of a 12 percent rate of interest on the loan was usurious, notwithstanding its characterization as a "collateral" mortgage. See Yellow Bird, Inc. v. LaBeau, Civ. No. 1975/809 (D.V.I., Div. St. Croix, April 12, 1976).

The court reaches this conclusion based upon the admissions on file, the testimony, the exhibits and the persuasive circumstantial evidence. In the plaintiff's pretrial memorandum the following appears:

[the defendant in 1973] applied to the plaintiff for the money to purchase the car *and to pay off Nova Scotia*. (Emphasis in original.)

While the testimony was clear that the 1973 loan was made to pay off the 1972 loan from People's, and not the Scotia loan, the above quote is a good indication of the con-

---

[12a] The court does not, however, decide if or under what circumstances a mortgage automatically may be extinguished by payment of the debt, notwithstanding the failure to record a release.

fusion that characterized the plaintiff's case. No mention was made in the pleadings, motions, or pretrial memoranda or order of the 1972 loan. In fact, the pretrial order embodied plaintiff's claim as an ultimate fact that the 1973 loan was to pay off the Scotia loan. Paragraph 2(d). It was not until trial that it became clear that there was a 1972 loan from People's.

■ In any event, it is clear that not only was the Scotia loan satisfied before the 1973 loan, but that the plaintiff was aware of this. The defendant testified that he first went to People's about a loan in January of 1973. He spoke to a Mr. Rodriquez and orally represented that he had an outstanding loan with Scotia that was secured by a first priority mortgage. Although there was no direct testimony on this point, it is clear that he either told Rodriquez or that Rodriquez knew that Scotia had possession of the original deed.[13] Rodriquez told the defendant that he first would have to pay off Scotia and bring the cancelled promissory note and the deed to People's.[14] This he did. Although the defendant failed to prove that the prevailing practice of lending institutions in the Virgin Islands is for the first priority mortgagee to retain the original deed (see Pretrial Order of May 30, 1978, Paragraph 3(h)), it is significant that both Scotia and People's insisted on possession of the deed. Clearly, since only one institution could have possession of the deed at any one time, the reasonable inference to be drawn is that People's knew that upon satisfaction

[13] There is no dispute that Scotia held the deed during the period of the Scotia loan. Paragraph 1(e) of the Pretrial Order; see also the Bank of Nova Scotia Memorandum of Deposit of Certificate of Title, Exhibit 7.

[14] On cross examination, Harold Vanterpool, an officer of F.D.I.C., was asked when People's received the deed to Parcel No. 48-5 Estate Frydenhoj and he replied that he didn't recall when the deed was received. The court finds as a fact that Mr. Griffith brought the deed to People's shortly after the satisfaction of the Scotia loan and before the 1973 loan was written. In other words, sometime between February 8 and February 27, 1973.

of the Scotia loan its loan would be secured by a mortgage with first priority status and that it was entitled to and did, in fact, demand possession of the deed. Moreover, there are other indicia of knowledge on the part of the officers of People's. The 1974 loan application indicates that no mortgage balance or monthly payments were due on the property in question and that the only creditor of the defendant was People's, and that this was with respect to the 1973 loan.[15] F.D.I.C. nonetheless maintains that it is entitled to rely on the record, and the record disclosed a mortgage lien until November 9, 1977. Whatever the merit of its position in the abstract, it is the law of this jurisdiction that 28 V.I.C. § 124 is inapplicable to purchasers who are not innocent of the true facts. Callwood v. Callwood, 3 V.I. 287, 158 F.Supp. 54 (D.V.I. 1958). Otherwise stated:

A person, in dealing with another in respect to real estate, may rely on the record title to the property, *in the absence of actual knowledge of the title in fact, or of facts sufficient to put him on inquiry in respect thereto.* (Emphasis added.)

66 Am.Jur.2d Records and Recording Laws § 99 (1973). The court, having found by the weight of the evidence that People's was aware of the satisfaction of the Scotia loan, must conclude that the plaintiff was not a "subsequent innocent purchaser in good faith" within the meaning of 28 V.I.C. § 124 as construed[16] and is not entitled to take advantage of the recording statute. Accordingly, the 1974 loan was usurious and, pursuant to 11 V.I.C. § 954, the entire interest must be forfeited.

■ Moreover, the double penalty prescribed by 11 V.I.C. § 953 also is chargeable against F.D.I.C. on the

---

[15] Plaintiff's Exhibit 5.

[16] The court does not decide what the outcome of this case would be if it determined that People's was unaware of the discharge of the Scotia loan and in fact relied on the Recorder of Deeds' Office.

$694.41 interest already paid.[17] The defendant's last payment on the 1974 loan was on March 15, 1977.[18] His answer and counterclaim was filed on October 28, 1977, a mere seven months later. Mr. Griffith's "action" thus was commenced well within the two-year period of § 953. The court believes that a penalty on the *entire* interest paid by the defendant is recoverable and not merely a penalty on that part paid within the last two years. The public policy of the Virgin Islands, as expressed by 11 V.I.C. § 951 et seq., is strongly against the imposition of usurious interest charges. To enforce the prohibitions of § 951, the Legislature in §§ 953 and 954 provided stiff penalties for its violation. To construe § 953 as imposing a double penalty only for the interest paid within two years of the commencement of the action would substantially defeat that section's purpose. The court believes that § 953 is, in effect, a special statute of limitations and that an action for recovery of double the entire interest paid may be brought at any time within two years of the date of last payment.

This result was permitted in Barclay's Bank v. Creque, 13 V.I. 161 (D.V.I. 1976), in which the defendant's first

---

[17] Plaintiff's Reply to Defendant's First Set of Interrogatories, answer No. 27, dated November 22, 1977. Although Harold Vanterpool testified that only $411.47 in interest had been received by People's and that F.D.I.C. was not collecting interest on the loan, the court discounts this testimony. Mr. Vanterpool testified that F.D.I.C. had collected $1,525.68 in principal and interest from Mr. Griffith. Plaintiff's Exhibit 13 reveals that on October 24, 1975, the date of F.D.I.C.'s succession to People's, the defendant's balance was listed as $3,051.36. This figure, when broken down, includes the unpaid interest at the rate of 12 percent. Adding the $1,525.68 paid to People's and the $3,051.36 claimed by F.D.I.C. to be due equals $4,577.04, the total amount of the 1974 loan plus interest and insurance charges. See Plaintiff's Exhibit 6. Therefore, although F.D.I.C. may not have *intended* to charge Mr. Griffith interest, it was, in fact, so charging him. Moreover, the court derived the figure of $694.41 not only on the basis of F.D.I.C.'s answers to interrogatories, but also because Mr. Vanterpool testified that that is the amount that the defendant would have paid, computed on a pro rata basis, if F.D.I.C. had continued charging him interest at the 12 percent rate.

[18] Plaintiff's Exhibit 13.

payment on the mortgage note was in June of 1973 and his last payment was in June of 1974. His defense to plaintiff's action was usury, and his answer was filed September 8, 1975. Chief Judge Christian, applying the double penalty provisions of § 953, held that the defendant "is entitled to receive twice the amount of all interest actually paid by him through June 1974," 13 V.I. at 168, although the defendant's first payments were made more than two years prior to the commencement of the defendant's action.

The defendant is therefore entitled to $1,388.82 pursuant to 11 V.I.C. § 953, and he need not pay any further interest pursuant to 11 V.I.C. § 954. Barclay's Bank v. Creque, supra; Yellow Bird, Inc. v. LaBeau, supra. Defendant also is entitled to recover the late charges he paid in the amount of $19.05. No allowance having been made therefor in the 1974 loan agreement, its imposition was clearly without authority. Thus, judgment will issue for the defendant in the amount of $1,407.87. Against this amount, F.D.I.C. is entitled to offset $1,261.97, the amount of principal still due and owing,[19] thereby reducing defendant's actual recovery to $145.90.

DEFENDANT'S COUNTERCLAIM

Defendant's counterclaim relates to the repossessed 1970 Plymouth automobile he purchased from People's with the proceeds from the 1973 loan. Mr. Griffith essentially raises two issues. First, he claims that he was required to pay the highway user's tax when he registered the vehicle in his name. As a result, he says the seller breached its im-

---

[19] The total amount of the 1974 loan, less interest, was $3,828.29. The total amount paid by Mr. Griffith thus far is $3,260.73 of which $694.41 is interest. Thus, the total principal paid by the defendant is $2,566.32. Subtracting this amount from the total of $3,828.29 yields a balance of $1,261.97 in principal that defendant still owes to the plaintiff.

plied warranty of good title. 11A V.I.C. § 2—312.[20] Defendant also claims that immediately after the purchase the vehicle remained in constant disrepair. Relying on 11A V.I.C. § 2—314, defendant alleges that the plaintiff breached its implied warranty of merchantability.[21]

■ The defendant's first contention is easily answered. The "security interest or other lien or encumbrance" against which the seller warrants are only those that are valid charges against the goods. The seller does not im-

---

[20] § 2—312. Warranty of title and against infringement; buyer's obligation against infringement

  (1) Subject to subsection (2) there is in a contract for sale a warranty by the seller that
    (a) the title conveyed shall be good, and its transfer rightful; and
    (b) the goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge.

  (2) A warranty under subsection (1) will be excluded or modified only by specific language or by circumstances which give the buyer reason to know that the person selling does not claim title in himself or that he is purporting to sell only such right or title as he or a third person may have.

  (3) Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

[21] § 2—314. Implied warranty: merchantability; usage of trade

  (1) Unless excluded or modified (§ 2—316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

  (2) Goods to be merchantable must be at least such as
    (a) pass without objection in the trade under the contract description; and
    (b) in the case of fungible goods, are of fair average quality within the description; and
    (c) are fit for the ordinary purposes for which such goods are used; and
    (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
    (e) are adequately contained, packaged, and labeled as the agreement may require; and
    (f) conform to the promises or affirmations of fact made on the container or label if any.

  (3) Unless excluded or modified (§ 2—316) other implied warranties may arise from course of dealing or usage of trade.

pliedly warrant against invalid liens or other interests. Cf. Lish v. Compton, —— Utah ——, 547 P.2d 223 (1976), where the court, construing § 2—201(3)(b) of the Uniform Commercial Code (U.C.C.),[22] which provides that a contract is enforceable if the party admits in court that it was made, held that the contract is enforceable only if the party acknowledges a *valid* and binding contract. Without deciding whether the highway user's tax is a security interest, lien or encumbrance on title, the court concludes that the imposition of the tax on the defendant was invalid. Pursuant to 33 V.I.C. § 72, the tax must be paid only on "registering a motor vehicle requiring licensing . . . in the Virgin Islands for the first time." Since the testimony was that the vehicle already had been licensed in the Virgin Islands,[23] defendant need not have paid the tax, and F.D.I.C. is not answerable simply because the defendant did in fact pay it.

■ Defendant's second contention also must fail. An implied warranty of merchantability under § 2—314 arises only where "the seller is a merchant with respect to goods of that kind." "Merchant" is defined in the U.C.C. to mean

A person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

11A V.I.C. § 2—104. As the official comments make clear, the U.C.C. makes a distinction between a merchant and the "casual or inexperienced seller," and equates a merchant with a professional for whom "special and clear rules" apply. Comments 1 and 2. Moreover, with respect to the

---

[22] This section of the U.C.C. is found in the Virgin Islands Code at 11A V.I.C. § 2—201(3)(b).
[23] See also Plaintiff's Exhibit 12.

qualification of § 2—314 that the seller be a merchant in order for an implied warranty of merchantability to arise, Comment 2 to § 2—104 states:

obviously this qualification restricts the implied warranty to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods.

■ There is no allegation, let alone evidence, upon which the court could conclude that People's sold the car to the defendant through an agent, broker or other intermediary, who held himself out as having knowledge or skills peculiar to automobiles. Consequently, People's could be a merchant within the definition of § 2—104 only if

(1) it dealt in the goods of the kind involved at the time or,

(2) by its *occupation* it held itself out as having knowledge or skill peculiar to the practices or goods involved in the transaction, even though it in fact lacked such knowledge. See Decatur Cooperative Ass'n v. Urban, 219 Kan. 171, 547 P.2d 323 (1976); Donald v. City National Bank of Dothan, 295 Ala. 320, 329 So.2d 92 (1976); Loeb & Company, Inc. v. Schreiner, 294 Ala. 722, 321 So.2d 199 (1975); 1 Anderson, Uniform Commercial Code § 2—104:4 (2d ed. 1970); see also Nelson v. Union Equity Co-Operative Exchange, 21 U.C.C. Rep. 1 (Tex. 1977). It is readily apparent that a bank by repossessing a used automobile and selling it does not, by virtue of being a bank, hold itself out as having special knowledge or skill with respect either to the goods or the practices involved. In fact, an inference that the bank merely wants to be paid to satisfy an outstanding loan would appear to be more justified.

■ The question of whether the bank "deals" in the goods of the kind involved is more difficult. As one court has noted, the U.C.C. does not define the term "deals." Nelson v. Union Equity Co-Operative Exchange, supra.

366

This court believes, based on the Comments to § 2—104, that the term "deals" envisions a continuing course of conduct with respect to goods of the kind involved as to give rise to a reasonable inference of professionalism. Cf. Continental Grain Co. v. Brown, supra; Decatur Cooperative Ass'n v. Urban, supra; Loeb & Company, Inc. v. Schreiner, supra. In the instant case defendant presented no evidence as to the frequency of the bank's dealings in repossessed automobiles. As the Alabama Supreme Court recently stated in a case where the defendant bank had sold a repossessed boat to the plaintiff:

> Obviously, a bank may be a merchant under the U.C.C. definitions (see Official Comments to § 2—104) ; but absolutely no evidence was offered in this case to bring the bank within either of the definitions [of § 2—104]. No evidence was offered that the . . . [b]ank . . . deals in the kind of goods involved in this transaction—boats— or that it holds itself out as having knowledge or skill peculiar to such goods.
>
> The record before the trial court and here indicates that sale of the boat was no more than an isolated transaction by the bank.

Donald v. City National Bank of Dothan, supra, 329 So.2d at 95; see Prince v. LeVan, 486 P.2d 959 (Alas. 1971). Nothing before this court indicates that the sale of the automobile to the defendant was anything more than an isolated incident. It may have been more than an isolated sale, but if it was, it was defendant's burden to prove it. This he failed to do. Accordingly, the court concludes that at the time of the sale at issue the bank was not a merchant within the meaning of the Uniform Commercial Code. As a result, no implied warranty of merchantability existed with respect to the car sold to this defendant, and his counterclaim must be dismissed.