**WALTER FEDDERSEN, Plaintiff/Appellant**
**v.**
**FRAUKE FEDDERSEN, Defendant/Appellee**

D.C. Civ. App. No. 1995/185

District Court

Division of St. Thomas and St. John

Sept. 10, 1999

230

Henry L. Feuerzeig, Esq., Simone R.D. Francis, Esq., St. Thomas, U.S.V.I., *for Appellant*

Carl J. Hartman III, Esq., Paul J. Ruskin, Esq.[1] , Kevin A. Rames, Esq., St. Croix, U.S.V.I., *for Appellee*

FINCH, *Judge of the District Court of the Virgin Islands*; BROTMAN, *Senior Judge of the United States District Court for the District of New Jersey*, Sitting by Designation; and ROSS, *Territorial Court Judge*, Division of St. Croix, Sitting by Designation.

## OPINION OF THE COURT

PER CURIAM

This appeal arose out of an action for divorce. The issues presented are: 1) whether the trial court erred in finding that the breakdown of the marriage was caused by Walter Feddersen's extramarital affair; 2) whether the court erred in awarding Frauke Feddersen a seventy-five percent (75%) interest in the parties' marital homestead; 3) whether the court abused its discretion in awarding Frauke Feddersen alimony in the amount of $223,742.63 and costs and fees in the amount of $77,605.10; and finally 4) whether the court erred in awarding Frauke Feddersen an interest in MAFF, Inc., MAFF II, Inc., Walter Feddersen Construction, and Atlantic Trading Company, Inc. For the reasons stated in this opinion, the judgment of the Territorial Court will be affirmed.

---

[1] Paul J. Ruskin was admitted *pro hac vice* on April 21, 1999.

## I. FACTS

Walter Feddersen ["Mr. Feddersen" or "appellant"] and Frauke Pohns Feddersen ["Mrs. Feddersen" or "appellee"] [collectively referred to as "the Feddersens"] began dating in Hamburg, Germany in 1963, and were married on February 6, 1970 in St. Thomas, Virgin Islands. Two sons were born of the marriage: Falk in 1971, and Kirst in 1972. In the beginning, Mr. Feddersen worked on a charter boat, in construction, and as a toolmaker. Later, Mr. Feddersen formed Walter Feddersen Construction ["WFC"] and invested in several other business ventures. Mrs. Feddersen initially worked in the charter industry, and then as a legal secretary and title searcher. She subsequently worked as a real estate broker in the early 1980s.

The Feddersens' marriage eventually became strained with frequent arguments and an apparent inability to communicate effectively. After attending marital counseling sessions and making several attempts at reconciliation, they separated on April 1, 1990. Mr. Feddersen concluded that the breakdown of the marriage was irreparable and filed for divorce on June 28, 1991.

Mr. Feddersen's Complaint alleged, *inter alia*, that with him as a contractor, and Mrs. Feddersen as a real estate broker, neither would be in need of alimony. The Complaint sought an equal division of both the marital abode at No. 7-O Estate Nazareth and jointly owned personal property in his wife's possession. Mr. Feddersen made little or no mention of the substantial assets acquired during the marriage, and essentially sought to have both parties go their separate ways after division of the marital homestead.

Mrs. Feddersen contested the divorce alleging that the breakdown of the marriage was caused by appellant's "unabated affair with a woman since April 1988." (Joint Appendix ["J.A."], Vol. I at 26.) She also argued that while appellant was capable of supporting himself, she was entitled to alimony to maintain the lifestyle to which she had become accustomed. Mrs. Feddersen further argued that her husband's equity in the marital abode should be substantially reduced to no more than twenty-five percent (25%) of its value because his affair was the proximate cause of the breakdown of the marriage. Finally, Mrs. Feddersen argued that the substantial

assets and personal property acquired during the marriage should be equitably divided by the court. Clearly, a chasm divided these parties in terms of the relief sought.

In addition to her answer and counterclaim, Mrs. Feddersen filed a Verified Complaint (Terr. Ct. Civ. No. 938/1991) against Walter Feddersen, Walter Feddersen Construction, Inc., MAFF, Inc., MAFF II, Inc., The Cove at Smith Bay (a limited partnership), Atlantic Trading Co., Inc. and VM/EASE, Inc.[2] seeking, *inter alia,* partition and requesting that the court declare her interest in all of these companies and their assets. Mrs. Feddersen also sought to have this matter consolidated with the divorce. That request for consolidation was denied in part, and granted only to the extent that "[t]he issues of the values of all real and personal property owned by the parties are consolidated and determinations as to those matters made in this action [for partition] shall be applicable" to the divorce action. (*Id.* at 51.)

Mr. Feddersen amended his complaint on or about December 9, 1992 adding that "[a]s the deterioration of the marriage was caused by the defendant's continuous mental cruelty and verbal abuse inflicted on the plaintiff since 1985, including unwarranted public and private screaming fits, name-calling, physical attacks, and the repeated and prolonged refusal of sexual relations, the plaintiff is entitled to at least a 75% interest in the marital homestead." (*Id.* at 48, 408-09.)

The trial court heard argument and testimony in this matter on thirteen different occasions before entering a decree of divorce on December 2, 1993.[3] The December 2nd decree stated that the court would address, at a later date, whether the breakdown of the marriage was due to Walter Feddersen's marital fault or misconduct, and, if so, to what extent fault would affect the disposition of the marital homestead and remaining issues in the divorce and action for partition.

---

[2] VM/EASE, Inc. is no longer in existence. (J.A., Vol. II at 701-04.)

[3] This matter came on for hearing before the Territorial Court on July 20, 1992, September 20, 21, 22, 23, 24, 27, 28, 29, 30, 1993 and October 13, 14, 29, 1993.

On February 3, 1995, the court placed its findings of fact on the record.[4] It then entered its Supplementary Findings of Fact on February 8, 1995. In that February 8th document, the court found that—despite his secrecy—Mr. Feddersen's income was in excess of Eight Million Dollars ($8,000,000). The Court buttressed this finding by noting that Mr. Feddersen's Skyline Drive Condominium project alone earned a profit in excess of One Million Two Hundred Thousand Dollars ($1,200,000), and he received Two Hundred Twenty-five Thousand Dollars ($225,000) in dividends from MAFF, Inc. for 1991-1992. The court also included revenues earned from rental properties and Mr. Feddersen's Prudential Bache investments in its calculation of income. Then, on April 7, 1995, the trial judge awarded Mrs. Feddersen $65,000 in attorney's fees, together with $12,605.10 in costs. The trial judge entered a Final Decree of Divorce and Judgment on October 18, 1995 awarding Mrs. Feddersen lump sum alimony in the amount of $223,742.63; a seventy-five percent (75%) interest in the former marital abode at 7-0 Estate Nazareth; and a fifty percent (50%) interest in the following:

(1) their jointly held real property;[5]
(2) WFC which owns condominiums 2A and 4D Skyline Village, as well as 3Q Estate Bakkeroe and 1D Estate Thomas;
(3) Mr. Feddersen's interest in MAFF, Inc. and MAFF II, Inc.;
(4) all dividends issued to Mr. Feddersen by MAFF, Inc. and MAFF II, Inc.
(5) the sail boat "Hamburg;"
(6) the Atlantic Trading Company
(7) all other personal property, including savings and checking accounts, either in personal or joint names, including but not limited to the Walter Feddersen Construction, Inc. account at the Bank of Nova Scotia, the

---

[4] (J.A., Vol. III at 1511-1571.)

[5] The real properties to be jointly owned by the parties as tenants in common are: 1) 9J-2 Estate Nazareth (in pleadings before this Court, appellant has made it clear that the trial judge's disposition of this property is not at issue on appeal); 2) 10P Estate Lerkenlund; 3) 7-P Estate Nazareth; and 4) 6AA-3 Estate Lerkenlund. (J.A., Vol. I at 110.)

Walter and Frauke Feddersen Realty account at Banco Popular, retirement accounts, certificates of deposit, furniture, fixtures, vehicles, and art work.

(J.A., Vol. I at 108-13.) Mr. Feddersen appeals the trial judge's findings of fact, conclusions of law, and exercise of discretion.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

This Court has appellate jurisdiction to review judgments and orders of the territorial court in all civil cases. *See* V.I. CODE ANN. tit. 4, § 33 (1997 & Supp. 1998); Section 23A of the Revised Organic Act of 1954.[6] Our review of the Territorial Court's application of legal precepts is plenary, and findings of fact are reviewed under a clearly erroneous standard. *See Prosser v. Prosser*, 34 V.I. 139, 144, 921 F. Supp. 1428, 1432 (D.V.I. App. Div. 1996); *Colombian Emeralds v. Historic Preservation Commission*, Civ. No. 93-225, 1996 U.S. Dist. LEXIS 20754 (D.V.I. App. Div. Dec. 23, 1996). Only where the lower court's finding is unsupported by a credible evidentiary basis will the reviewing court reverse its decision, with due regard being given to the trial judge's opportunity to determine witness credibility. *See* 4 V.I.C. § 33; *see also Rabsatt v. Estate of Savain*, 31 V.I. 237, 239, 878 F. Supp. 762, 764 (D.V.I. App. Div. 1995); *Mayers v. Mayers*, 1986 St. X. Supp. 165, 174 (D.V.I. 1986). The "clearly erroneous" standard protects findings of fact from reversal to a certain extent, but does not apply to findings of law, which are reviewed de novo. *See* STEVEN A. CHILDRESS & MARTHA S. DAVIS, FEDERAL STANDARDS OF REVIEW § 2.01 (2d ed. 1992). Finally, the trial court's alimony award, and disposition of the marital homestead are reviewed for abuse of discretion. *See Coman v. Coman*, 492 F.2d 273, 278 (3d Cir. 1974); *Barrows v. Barrows*, 489 F.2d 661 (3d Cir. 1974).

### B. Whether the Evidence was Sufficient for the Trial Court to Find that the Breakdown of the Marriage was Caused by Mr. Feddersen's Extramarital Relationship.

The Virgin Islands Code provides that fault is a proper

---

[6] The Revised Organic Act of 1954 is found at 48 U.S.C. § 1613a (1994), reprinted in V.I. CODE ANN., Organic Acts, 73-177 (codified as amended) (1995 & Supp. 1998) (preceding V.I. CODE ANN. tit. 1) ["Revised Organic Act"].

consideration in dividing the marital homestead in accordance with the equity of the case. *See* 33 V.I.C. § 2305(d); *Charles v. Charles*, 1985 St. T. Supp. 75 (D.V.I. 1985), *aff'd*, 788 F.2d 960 (3d Cir. 1986). In the divorce decree entered on December 2, 1993, the trial judge stated, *inter alia*, that he would decide at a later date

> whether the breakdown of the marriage was due to plaintiff's marital fault or misconduct, as that principle is enunciated in *Charles v. Charles*, 788 F.2d 960 (3d Cir. 1986), and if fault or misconduct occurred, to what extent it directly affects the disposition of the marital home and indirectly affects the remaining issues in the divorce . . . .

(J.A., Vol. I at 65.)

The Feddersens dispute the exact point when they began experiencing marital difficulties. Mr. Feddersen contends that there was serious marital discord from about 1979 or 1980. (J.A., Vol. II at 781.) Mrs. Feddersen, on the other hand, contends that any arguments over the years were no more serious than one would find in any other marriage, but it was her husband's infidelity from 1988 that caused the breakdown of the marriage.

The Feddersens sought marital counseling from as early as 1986 in an attempt to save the marriage. Dr. Daniel J. Robert testified that he counseled the Feddersens between November 1986 and June 1987. In twenty-four individual and joint counseling sessions—two of which included their children—Dr. Robert noted that: 1) although the Feddersens indicated that they loved each other, the state of the marriage was "pretty bad" in that "the two of them needed some help in communication"; 2) Mrs. Feddersen accused Mr. Feddersen of being a dictator, and not listening to her; and 3) Mr. Feddersen complained of his inability to have "peace and quiet" and his unwillingness to discuss business at home. Mr. Feddersen also complained of his wife's verbal abuse, screaming, and unwillingness to have sexual relations for extended periods of time. Finally, Dr. Robert noted that both parties were experiencing anger and joint pressure daily while building their home.

Mrs. Feddersen denies withholding sexual relations for extended periods, but says that she did not have sex with her

husband if they were angry at each other. However, in a letter written to her husband, Mrs. Feddersen apologized for not being able to fulfill his needs, and said she had "enjoyed being a mother, wife, however inadequate in your opinion, and housemaker." (J.A., Vol. I at 490-94.)

On February 8, 1995, the court concluded that the Feddersens "had a good life together and enjoyed an upper middle class [lifestyle], until Jane Oliver became romantically involved with Walter." (J.A., Vol. I at 102-03.) Based upon our review of the record, the trial judge's finding that Mr. Feddersen's affair was the cause of the demise of the marriage is not clearly erroneous.

Mr. Feddersen met Jane Oliver ["Jane"] in 1988, and, shortly thereafter, began having an affair. While Mrs. Feddersen vacationed in Maine during the summer of 1988, her husband's affair with Jane continued. In July of 1988, Mr. Feddersen brought Jane to St. Thomas to sail on the Hamburg, a boat he owned jointly with his wife. After Jane left St. Thomas, Mr. Feddersen made frequent calls to her in Fort Lauderdale.

Mrs. Feddersen became suspicious that her husband might be seeing another woman after receiving flowers from him (something she alleges he never did before), noticing telephone calls to Fort Lauderdale, Florida, and finding out that, although Mr. Feddersen had borrowed another diving tank and gone sailing for a week, his friend Mario did not accompany him as he had claimed. Mrs. Feddersen tried soliciting information from family friends, Axel and Ursula Wirtman, and Mel Luff regarding her husband's infidelity. Her suspicions were confirmed when Mr. Feddersen admitted having the affair. (J.A., Vol. I at 141, 258, 480, Vol. II at 983, 991.) Mrs. Feddersen returned from her annual vacation in Maine on August 9th or 10th, 1988, the day before her husband was to fly from St. Thomas to Germany with his friends Dr. Axel Wirtman and Mario. Mrs. Feddersen testified that she and her husband argued about the affair the day she returned from her vacation, but Mr. Feddersen denies that the affair was the basis of the argument. The next day, he left for Germany, and his first stop was in Fort Lauderdale where he again met Jane.

Mrs. Feddersen testified that she was so distraught after learning about the affair that she called Mr. Feddersen constantly while he

was in Germany. Mr. Feddersen denies receiving frequent calls from his wife while in Germany, but the parties were in contact because they flew from Germany and St. Thomas respectively, to meet in New York, where they reconciled. Mrs. Feddersen testified that although she and her husband enjoyed some good moments while in New York, she was devastated when he admitted that he did not love her as much as he used to. In public, however, Mrs. Feddersen says that her husband pretended to be very much in love with her. Mr. Feddersen testified that he called Jane to tell her of his decision to stay with his wife, but the record indicates that he and Jane maintained contact.

Once they returned to St. Thomas, Mrs. Feddersen says her husband was "very preoccupied and at times distant, at times very attentive, seemed very confused, and at times he tried to get out of my way or other times he wanted to do things with me and be with me." (J.A., Vol. II at 1049.) Mrs. Feddersen further testified that because her husband's changing moods made her paranoid, she sought counseling from Nancy Byram for several months in 1988.[7] Mr. Feddersen attended one counseling session. Mrs. Feddersen tried to accommodate her husband in that she started using hormone patches, traveled a lot with her husband, and got involved in things he liked to do.

Mrs. Feddersen alleges that the marriage deteriorated further once Mr. Feddersen started visiting Jane again in 1989. Mr. Feddersen moved out of the marital homestead for several weeks in 1989, and made his final move from the marital home in 1990. He commenced divorce proceedings in 1991. Although Mr. Feddersen had left the marital home in 1990, he testified that he sent flowers to his wife as late as 1991. When asked by his counsel, "Considering your testimony of your separations, serious problems from 1988 and before, why were you sending her flowers as late as of 1991?" Mr. Feddersen replied, "Because we basically had a good relationship, you know. The kids were forth and back, that's why. Good relationship." (*Id.* at 895.)

■   The trial judge weighed the parties' credibility, and determined that Mr. Feddersen's conduct contributed significantly to

---

[7] Nancy Byram was deceased at the time of trial.

238

the demise of the marriage. The Court of Appeals for the Third Circuit has cautioned that:

> It is the responsibility of an appellate court to accept the ultimate factual determination of the factfinder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of these factors, it may not alter the facts found by the trial court. To hold otherwise would be to permit a substitution by the reviewing court of its finding for that of the trial court, and there is no existing authority for this in the federal judicial system, either by American common law tradition or by rule and statute.

*Bloch v. Bloch*, 473 F.2d 1067, 1068-69 (3d Cir. 1973). We find that the trial judge's conclusion as to the cause of the breakdown of the marriage is sufficiently supported by the evidence.

## C. Whether the Court Erred in Excluding a Portion of Christa Matthews' Testimony.

Christa Matthews ["Ms. Matthews"], a former tenant of the Feddersens, appeared in court to testify on behalf of Mr. Feddersen. Ms. Matthews testified that in 1986, while she rented an apartment downstairs of the Feddersens' residence, she heard two people making love on the balcony upstairs. She says she believed the people to be the Feddersens until learning the next day that Mr. Feddersen was still in Germany. Defense counsel objected to this testimony on grounds that Mr. Feddersen had never raised the issue of infidelity in the two years preceding the trial, and to allow it at that point would be prejudicial to the defendant. Plaintiff's counsel countered by arguing that Ms. Matthews had appeared on every witness list, thereby allowing the defense ample time to depose her. The judge determined that Ms. Matthews' testimony had no relevancy to the issues before the court.

Although Mr. Feddersen's counsel on appeal argues that the trial court should have allowed an amendment to the pleadings, his

trial counsel made it clear that no such amendment was being sought. (J.A., Vol. I at 302.) Instead, Mr. Feddersen's counsel proffered the testimony to rebut the plaintiff's claim that the marriage broke down in 1988 because of Mr. Feddersen's affair. The Federal Rules of Civil Procedure[8] provide in pertinent part that:

> *(a) Amendments.* A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . and the action has not been placed upon the trial calendar, the party may so amend . . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. . . .
>
> *(b) Amendments to Conform to the Evidence.* When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. *If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.*
>
> . . . .
>
> *(d) Supplemental Pleadings.* Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental

---

[8] Absent local law to the contrary, the Federal Rules of Civil Procedure apply in the Territorial Court of the Virgin Islands. TERR. CT. R. 7.

pleading setting forth transactions or occurrences or events *which have happened since the date of the pleading sought to be supplemented. . . .*

Fed. R. Civ. P. 15 (emphasis added). After reviewing Rule 15, the trial judge ruled that it did not apply under these circumstances, and "as a matter of fact, I don't even have to get a Rule 15 to try to continue the trial to give the defendant an opportunity to depose the witness. Certainly this is something out of the blue. If I allow this witness to testify . . . then it would make a mockery out of the discovery rules." (J.A., Vol. I at 308.)

Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Additionally, Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

■ Evidentiary rulings are reviewed for abuse of discretion, with substantial deference being given to the judge under Federal Rule of Evidence 403. *See Hurley v. The Atlantic City Police Dept.*, 174 F.3d 95, 1999 WL 150301, at *8 (3d Cir. 1999); *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 132 (3d Cir. 1997); *Government of the Virgin Islands v. Archibald*, 28 V.I. 228, 987 F.2d 180, 186 (3d Cir. 1993); *Dunn v. HOVIC*, 28 V.I. 526, 1 F.3d 1362, 1369 (3d Cir. 1993). Where, as in this case, defense counsel did not identify Rule 403 in her objection, but she expressly objected to the evidence as prejudicial, "[s]uch an objection was sufficiently specific to meet the requirements of Fed. R. Evid. 103(a) and to confer on the [territorial] court the responsibility of articulating the grounds for denying the objection." *See Archibald*, 987 F.2d at 186 n.7 (citation omitted). The trial judge ruled:

It's not that what she had was not discoverable before now. In as much as she showed up on a witness list, then I'm sure that the plaintiff must have known what she was going to testify . . . . For all intents and purposes, I find

241

that this testimony is highly not relevant to the issues I have to try, and it would be prejudicial, and I'm going to strike her testimony from the record because it does not involve any issue raised here, and it has no relevancy. More important, no issue regarding the defendant['] s infidelity has [ever] been raised before, until today. That is the ruling of the Court.

(J.A., Vol. I at 308-09.) This decision to exclude evidence may not be reversed unless it is "arbitrary and irrational." *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir. 1990).

■ In determining whether the trial judge erred in excluding Ms. Matthews' testimony, this Court must accord substantial deference to the trial judge's decision to exclude evidence. As the record indicates, the time and cause of the breakdown of the marriage were indeed relevant to this divorce proceeding, particularly with regard to fault. However, the trial judge believed that its proffer at the eleventh hour would be more prejudicial than probative. Because, as the trial judge stated, the issue was never raised, and the pleadings not properly amended, we find that the trial judge did not abuse his discretion in excluding Ms. Matthews' testimony.

## D. Distribution of the Marital Homestead

A "homestead" is defined as "the abode including land and buildings, owned by, and actually occupied by, a person, or by members of his family free of rental changes." 33 V.I.C. § 2305(a). It is well settled that the trial judge has broad discretion to consider the equity of the case in disposing of the marital homestead. *See Charles*, 788 F.2d 960. A reviewing court may find that there has been an abuse of discretion where "there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing the relevant factors." *Newland Moran Real Estate v. Green Cay Properties, Inc.*, 41 F. Supp. 2d 576, 1999 WL 183755, at *2 (D.V.I. App. Div. 1999) (quoting *Virgin Islands Water & Power Authority v. Virgin Islands Telephone Corp*, 1981 U.S. Dist. LEXIS 9330, 18 V.I. 451, 453 (D.V.I. 1981)).

■ Disposition of the marital homestead (unlike determinations regarding alimony, divorce, and support) allows for consideration of fault. *See Charles*, 788 F.2d at 966 n.14 (holding that fault is considered in disposing of the marital homestead); *see also Stridiron v. Stridiron*, 698 F.2d 204 (3d Cir. 1983). "The rationale for allowing marital misconduct to be utilized as a factor in the property disposition is that a spouse whose conduct has contributed substantially to the breakdown of the marriage should not expect to receive a financial kudo for his or her misconduct." *Charles*, 788 F.2d at 960. In disposing of the marital homestead, the trial court shall review the circumstances surrounding the couple's lives, the properties of each respective spouse, and any culpable conduct. *See, e.g., Fuentes v. Fuentes*, Civ. No. D89/1995, 1997 WL 889532, at *4 (Terr. Ct. May 12, 1997).

■ Here, the court found that "Walter's fraternizing and carrying on an active love affair with Jane during the course of the marriage significantly contributed to the breakdown of the marriage." (J.A., Vol. III at 1534-39.) The trial judge listened to several weeks of testimony and, on the basis of the entire record, determined that the circumstances of the case warranted a distribution of 75% interest in the marital homestead to Mrs. Feddersen and 25% interest to Mr. Feddersen. Based upon this extensive record and the evidence recited supra at section B, we find that the homestead award does not reflect a clear error of judgment.

### E. Alimony

In 1973, Title 16 of the Virgin Islands Code was amended to change the previously fault-based alimony law to a need-based rule which provides in pertinent part:

> Whenever a marriage is . . . dissolved the court may, without regard to any determination that the breakdown of the marriage was the fault of one party or the other, further decree:
>
> . . . .
>
> (3) for the recovery for a party determined to be in need thereof an amount of money in gross or installments, as may be necessary for the support and maintenance of such party . . . .

243

16 V.I.C. § 109. Alimony should neither be a punishment for the payor nor a reward for the payee,[9] and it should be award based upon:

> the amount of property of each, the circumstances surrounding the parties, the wife's necessities, and the husband's financial ability, the physical condition of the parties, the nature of their life together, and in these modern times the wife's independence and ability to earn her own way, which must all be considered by the court in the exercise of its discretion in awarding or denying alimony.

*Coman,* 492 F.2d at 278 (citations omitted).

Mr. Feddersen contends that the trial judge failed to apply the requisite factors in making a determination of alimony. Mrs. Feddersen contends that the trial judge appropriately found that Mr. Feddersen had attempted to conceal his true net worth, and, therefore, did not abuse his discretion in granting a lump sum alimony award of $223,742.63.

Contrary to appellant's assertion, the trial judge specifically noted that the above-stated factors were being considered,[10] and determined that despite Mr. Feddersen's "selective memory," his assets, stocks, bonds, and other income producing property were sufficient to allow for the lump sum alimony awarded. The court found that:

> Frauke's need for support is illustrated by her income statement which reflects a deficit for Frauke's necessities. . . . The Court finds that Walter has the ability to pay the alimony. . . . Both parties are in fairy [sic] good physical condition. There is no testimony that either party is ill or afflicted with any physical malady. Whereas, Frauke has the ability to "earn her own way," she is presently in dire need of a lump sum infusion of cash to get her restarted in the business world, because of her long absence and isolation from employment or involve-

---

[9] *Accord Aronson v. Aronson,* 245 N.J. Super. 354, 364, 585 A.2d 956 (App. Div. 1991).

[10] (J.A., Vol. III at 1525-26.)

ment in an active business venture. Undeniably, she is in dire need of rehabilitative alimony.

Walter's situation is entirely different. He has been active in the business community with his investments and has played a pivotal role in the development of MAFF, Inc. He has made certain investments with Prudential Bache and Co.

He had full control of Walter Feddersen Construction company which he used for his business ventures and his personal needs, despite his allegation that the company has not been involved in construction since Hurricane Hugo (September 17 & 18, 1989). Yet, the absence of construction activities did not preclude or inhibit Walter from utilizing the company for business ventures such as a $200,000.00 bank loan to invest in MAFF, Inc.

J.A., Vol. I at 102-03.)

The trial judge also looked at Mrs. Feddersen's financial statement and found that

ever since the inception of the filing of divorce on June 27, 1991, [Mrs. Feddersen] has had to struggle because the financial things ha[d] already been in Walter's name. . . . It was so difficult to . . . get to the heart of Mr. Feddersen's assets because he has shrewdly moved it around from one company to the other.

I find that the figure that I have come up with is not too speculative knowing that this thing was filed from in 1990 and since that time he had been getting some good income from all of the other property that they have owned.

(J.A., Vol. III at 1529-30.) Moreover, the court heard testimony regarding Mrs. Feddersen's projected monthly living and household expenses. (*Id.* at 1215-25, 1618-19.) Those expenses included medical insurance, physical therapy, pool service, extermination, interior home improvement, car expenses, cable television, telephone, water, electricity, food, clothing, entertainment, gifts, housekeeping service, travel, broker listing fees, and other personal expenses.

245

■ An abuse of discretion "requires proof of more than a mere error in judgment, but rather evidence that the law was misapplied or overridden, or that the judgment was manifestly unreasonable or based on bias, ill will, prejudice, or partiality." *Simmons v. Simmons*, 723 A.2d 221, 222-23 (Pa.Super. 1998). Having carefully examined the record, this Court is mindful not to usurp the trial court's duty as the finder of fact. We find no abuse of discretion with regard to alimony.

## F. Interest in Walter Feddersen Construction

After the birth of their second child, Mrs. Feddersen ceased working as a legal secretary and became a homemaker. It is undisputed that she also assisted her husband at WFC which was incorporated in 1976, but the parties differ as to the extent of her duties and their respective interests in that business. Mr. Feddersen contends that he is the 100% owner of that corporation, and Mrs. Feddersen is claiming a 50% interest. From the record it is clear that while the Feddersens were of modest means when they entered their marriage, they later acquired many valuable assets.

At WFC, Mrs. Feddersen says she was not only responsible for administrative and clerical tasks such as preparing payrolls, filing Workmen's Compensation and Social Security reports, and preparing tax returns, but also for occasionally transporting workers to and from job sites when her husband was unable to do so, and relaying messages.[11] Mr. Feddersen, on the other hand, contends that he is the sole owner of WFC as evidenced by his corporate papers and tax returns. Mrs. Feddersen counters that even if, for the sake of argument, Mr. Feddersen was the 100% owner of WFC, she would be entitled to a 50% interest in that corporation. She specifically contends that as husband and wife their money and jointly owned properties were used to secure bank financing for houses and other projects undertaken by WFC. In fact, Mr. Feddersen admits that personal as well as jointly owned properties

---

[11] Mrs. Feddersen's account of her duties was corroborated by Mr. Feddersen's testimony, but he added that she did "very little" work at WFC after 1983. (J.A., Vol. I at 535-36, Vol. II at 659-661.) His testimony indicates, however, that after 1983 Mrs. Feddersen assisted in balancing the checking account, dealing with the accountants and collecting rent. (*Id.*)

were used as collateral to secure loans for WFC's construction projects. (J.A., Vol. I at 538-39.) Mr. Feddersen also admitted at trial that he uses the WFC checking account as his personal account, while Mrs. Feddersen no longer had access to it. (*Id.*, Vol. II at 838-39, 891.)

In 1986 alone, Mr. Feddersen commenced several building projects: 1) a condominium complex called Skyline Village, 2) two houses at 7-O and 7-P Waterpoint, and 3) another house in Frenchman's Bay. The Feddersens owned several properties,[12] and, in December 1986, moved into the house at # 7-O Estate Nazareth.

Then, in 1987, Mr. Feddersen, along with three other investors, formed MAFF, Inc. to develop water properties. Although the court examined records presented at trial pertaining to the financial status of MAFF, Inc. and The Cove at Smith Bay, the judge commented that he needed

> some indication or idea as to something about the value of the assets—I mean the value of the shares of the corporation. Right now where they are omitting all that information—basically, that report could not give me a feeling about anything, if all that data which is relevant and pertinent data for evaluation for the company's value, if that is omitted, really, it's a financial statement without a financial statement. That's what it is.

(*Id.* at 856.)

Mrs. Feddersen called expert real estate appraiser John Garfield ["Garfield"] to testify that after calculating the diminution of present value, the market value of the 157 lots sold by MAFF at Smith Bay was approximately $6,119,500.00. On cross-examination, Garfield clarified that his determination of market value was simply a compilation of the prices MAFF hoped to get, and not an appraisal of the actual value of said property.

---

[12] A December 1991 financial statement from the Bank of Nova Scotia indicates that the Feddersens owned property at 7-O Estate Nazareth (Mrs. Feddersen's current residence), 7-P Estate Nazareth (Mr. Feddersen's current residence), 10P Estate Lerkenlund, 4D and 2A Estate St. Joseph and Rosendahl 9J-2 Estate Nazareth (½ acre unimproved property), and a two bedroom condominium in Boothbay Harbor, Maine. (J.A., Vol. II at 731.)

In 1988, Mr. Feddersen alleges that he formed Atlantic Trading Company ["Atlantic"] (of which he contends he is the 100% owner) on Mrs. Feddersen's request "to limit their liabilities arising from the acquisition of an airplane" which is its "sole asset." (Brief of Plaintiff-Appellant Walter Feddersen ["Br. of Appellant"] at 9; J.A., Vol. I at 553.) Mr. Feddersen testified that, in 1988, he sold the single engine Cessna plane which he owned jointly with his wife for $28,000, and bought the twin engine Cessna 337 owned by Atlantic for Thirty-One Thousand Five Hundred Dollars ($31,500). On cross-examination, however, it was revealed that in addition to owning the airplane, Atlantic purchased a $675,000 judgment from the Government of the Virgin Islands.[13] Mr. Feddersen's business associate, real estate developer William L. Mahaffey ["Mahaffey"] later testified that Atlantic bought a $770,000.00 judgment from the Government of the Virgin Islands with loans of approximately $250,000.00 from each of MAFF's stockholders (Mahaffey, Walter Feddersen and John Foster).[14] Mr. Feddersen later collected in excess of $500,000 on the judgment, and endorsed that check over to MAFF, Inc. (*Id.* at 713.) The Feddersens were also joint owners of a sailboat, the "Hamburg". (J.A., Vol. I at 551, Vol. II at 696-700.)

After weighing the evidence presented and assessing its credibility, the trial judge found that

> this case . . . presents the ultimate in greed, avarice, unfairness and inconceivable dishonesty between spouses. Moreover, I find that Walter is now seeking to frustrate, to take away and deprive Mrs. Feddersen, Frauke, of her fair share of the assets acquired during the marriage and to which she contributed either directly or indirectly towards their acquisition.
>
> I find that Walter deceived Frauke during the marriage by putting assets in his sole name and boldly claiming

---

[13] The judgment in question was being held by the Government of the Virgin Islands, Department of Finance and the Bureau of Internal Revenue against the Lindquist family. (J.A., Vol. II at 709.)

[14] Mr. Ed O'Brien also became a financial partner in MAFF, but his involvement was subsequent to the initial $250,000.00 investment made by each of MAFF's stockholders. (J.A., Vol. II at 961-62.)

sole ownership and now . . . . conveniently overlooks the fact that she undeniably helped him in making him the wealthy man he is today. She was always there for him during the marriage in the good times, [and] the bad times. From the very inception when they were living in a shack she was there for him.

. . . .

She contributed intangible factors to the marriage — she offered comfort and support to all of Walter's business ventures and . . . . She signed personal guarantees and did everything in order for him, for the company to get certain mortgage loans from the bank of Nova Scotia to make them what has now turned into the millions of dollars we have in the matter.

. . . .

I find that the parties were working as a team in which they both contributed towards the maintenance and lifestyle of the family in the support and upkeep of the family and in acquiring certain properties and assets they now own today.

(J.A., Vol. III at 1519-20, 1522-23.)

■ "Whether an asset is marital property or separate property for purposes of distribution of the marital estate, is a matter reserved to the sound discretion of the trial court." *MacAleer v. MacAleer*, 1999 PA Super 35, 725 A.2d 829, 831 (Pa.Super. 1999). Once these distinctions have been made, the trial judge has broad equitable powers in disposing of marital property. *Fuentes*, 1997 WL 889532, at *5. As such, there is an abuse of discretion only if the trial court has misapplied the law or failed to follow proper legal procedures. *MacAleer*, 725 A.2d at 831. The trial judge had an opportunity to weigh the testimony and credibility of the witnesses before determining the equitable distribution of the marital property, and we do not find that there has been an abuse of discretion.

## G. Fees & Costs

The Virgin Islands Code provides in relevant part that "there shall be allowed to the prevailing party in the judgment such sums

249

as the court in its discretion may fix by way of indemnity for his attorney's fees in maintaining the action or defenses thereto . . . ." 5 V.I.C. § 541(b). The decision of whether and to what extent fees should be awarded is within the court's discretion. *Lempert v. Singer*, 1993 U.S. Dist. LEXIS 19923, 29 V.I. 169, 172 (D.V.I. 1993) (citing *Bedford v. Pueblo Supermarkets of St. Thomas, Inc.*, 1981 U.S. Dist. LEXIS 9369, 18 V.I. 275, 277 (Terr. Ct. 1981)). This decision will not be disturbed on appeal unless the trial judge plainly abused his discretion. *See, e.g., Adams v. Adams*, 1999 PA Super 36, 725 A.2d 824, 829 (Pa.Super. 1999).

■ Appellant sought indemnification for Eighty-six Thousand One Hundred Five Dollars and Ten Cents ($86,105.10) in costs and fees. The court considered: 1) the time and labor required, 2) the novelty and difficulty of the questions involved, 3) the requisite skill to properly conduct the cause, 4) the customary charges of the bar for similar services, 5) the amount involved in the controversy, 6) the benefits resulting to the client from the services, 7) the contingency or certainty of the compensation, 8) the number of hours spent, 9) the activities to which time was devoted, and 10) the quality of work done and the likelihood of success. (J.A., Vol. I at 104-07.) The trial judge explained the factors considered in making his decision, and did not award the full amount requested. Instead, he reduced the sum by Eight Thousand Five Hundred Dollars ($8,500), thereby awarding appellee Seventy-seven Thousand Six Hundred Five Dollars and Ten Cents ($77,605.10). We recognize, as did the trial judge, that this matter was very complex and time consuming. As such, there is no apparent abuse of discretion.

### Conclusion

For the above-stated reasons stated, we affirm the judgment of the trial court.