# GULF TRADING CORPORATION and ISLAND HARDWARE CORP., Appellants

## v.

# NATIONAL ENTERPRISES OF ST. CROIX, INC., Appellee

D.C. Civ. App. No. 1993-254
Terr. Ct. Civ. Nos. 205 & 206/88

District Court of the Virgin Islands

Div. of St. Croix

January 24, 1996

WILFREDO A. GEIGEL, ESQ., LAW OFFICES OF WILFREDO A. GEIGEL, *for Appellant*

LOLITA D'JONES DE PAIEWONSKY, ESQ., *for Appellee*

MOORE, *Chief Judge*, District Court of the Virgin Islands; BROTMAN, *Sr. Judge of the United States District Court for the District of New Jersey*, Sitting by Designation; and MEYERS, *Territorial Court Judge of the Virgin Islands*, Division of St. Thomas and St. John, Sitting by Designation.

## OPINION OF THE COURT

We here decide whether the Territorial Court erred in finding that Gulf Trading Corporation and Island Hardware Corp. [collectively "Gulf Trading" or "appellants"] sent inferior goods to National Enterprises of St. Croix ["National" or "appellee"] which resulted in a set-off against amounts due Gulf Trading.

## BACKGROUND

Sometime in or around March, 1986, in Puerto Rico, Gulf Trading agreed to supply National with lumber for resale at appellee's business on St. Croix.[1] A representative of Gulf Trading offered to "arrange an account" for National because National's representative, Antoine Murray, "[didn't] have a lot of money to purchase more than what . . . [he] came for now."[2] Murray testified that he accepted the offer on behalf of National, which included the oral arrangement that appellee would pay for goods he had ordered and leave a $5,000.00 deposit on account for any future orders. National's understanding was that it would pay for goods provided by Gulf Trading after it had sold them in the Virgin Islands.[3] National, through Murray, placed an order directly with Gulf Trading's representative, Andres de la Torres, based upon the experience and advice of de la Torres.[4]

Murray testified that National ordered "pitch pine" on April 18, 1986, but instead received "Chilean pine," which he stated is a substandard substitute. Appellee's evidence below was also that it received different and inferior alternatives for the particular types

---

[1] National contends that it was led to believe it was doing business with one company.

[2] Appendix ["App."] Part II, p. 50.

[3] *Id.* at 52, 60-61, 69-70, and 84-85.

[4] *Id.* at 56.

of plyform and plywood it had ordered. Murray testified that when he called de la Torres to complain about the substitutions of inferior goods, de la Torres told him that the mistaken delivery resulted from a warehouse error, but that appellee should go ahead and try to sell them because it would not have to pay for the merchandise until it was sold. Among other things, de la Torres told Murray that the Chilean pine was "new on the market" and he should "[t]ry it."[5]

Likewise, the next delivery of goods Murray ordered did not conform to the specifications of the order, namely, a greater number of doors of a different size were delivered than were ordered. At first, Murray refused to accept delivery because the goods were non-conforming. However, in reliance on de la Torres' repeated assurances that no payment was required until the goods were sold, appellee finally accepted delivery.[6]

Thereafter, National ordered and received 244 sheets of plywood sometime during June, 1986, 98 of which were defective due to warping.[7] Murray testified that although appellant, through de la Torres, agreed to replace the defective pieces, the defective pieces were never retrieved, disposed of, or replaced by Gulf Trading.[8] Murray later placed yet another order with appellant on the expectation that National would be credited for the defective lumber. When Murray complained that no credit was given, de la Torres promised to discuss this with his superior and "take care of that."[9] National contested still another order, dated August 1, 1986, because the kind, description, and size of the wood did not conform to the order.[10] Murray later also complained that doors delivered were of a different kind than ordered.[11]

Appellants sued National for debt and National filed a counter-claim for fraudulent misrepresentation. When it became clear to

[5] *Id.* at 60-61.

[6] *Id.* at 69.

[7] National claims the defects could not be discovered until they were purchased by customers because the sheets were 'tied down.'

[8] *Id.* at 72- 74.

[9] *Id.* at 74.

[10] *Id.* at 78-80.

[11] *Id.* at 82-84.

the court that an expert was needed to assist in calculating and providing the court with an intelligible understanding of the values and quantities involved in this case, Pablo O'Neil, an accountant, was appointed for this purpose.[12] At trial on the counterclaim, the judge found that the lumber Gulf Trading had supplied was inferior and, for the most part, could not be resold, and granted an offset against the amount owed.[13]

Accordingly, the court accepted the accountant's finding that appellants were owed $28,531.24, consisting of $8,231.73 to Island Hardware and $20,299.51 to Gulf Trading, less six payments by National of $11,803.00, offset by $14,001.59 worth of goods, which the court found National had rejected as inferior.[14] After all the calculations, the Territorial Court found that Gulf Trading was entitled to judgment in the amount of $2,726 based on the set-off. This appeal ensued.

## DISCUSSION

Although neither the Territorial Court nor either of the parties stressed the importance of the Uniform Commercial Code ["U.C.C."] at trial, the U.C.C. applies to this case of a transaction dealing in goods. Our task is to determine whether the trial judge's findings can be rationalized and upheld under the U.C.C. or whether the case must be reversed.

Contract interpretation involves mixed questions of law and fact. We exercise plenary review over questions of law. *Nibbs v. Roberts,* 31 V.I. 196 (D.V.I. App. 1995); *In re Barrett,* V.I. BBS 91CI159A.DX2 (D.V.I. App. Jan. 31, 1995). Findings of fact are reviewed under a clearly erroneous standard, with due regard

---

[12] App. Part I, pp. 46-49.

[13] The parties have agreed that the lumber and materials supplied that are the subject of this suit were either destroyed or looted during Hurricane Hugo and its aftermath, and are no longer in existence. No insurance claims have been or will be filed by either party for such loss.

[14] Although the parties differ regarding the accountant's role and status, the record clearly reflects that he was appointed as an expert, not as a master. Since he only examined Gulf Trading's side of the controversy, and did not take into consideration National's side, it was necessary for the judge to factor in the offsetting amount to the accountant's findings. We accept the offsetting figures applied by the court since appellants did not include in the record any exhibit or document detailing the amounts offset.

being given to the trial court's opportunity to determine witness credibility. V.I. Code Ann. tit. 4, § 33 (1967 & Supp. 1995).

It is clear that appellants are "merchants" under the U.C.C.:

[A] person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

11A V.I.C. § 2-104(1). And Gulf Trading refers to itself as a company that "[s]pecializes in certain types of lumber, plywood and other lumber-related products . . . ."[15]

As a merchant under the U.C.C., then, Gulf Trading gave an implied warranty of merchantability to National, which made appellants responsible for any unmerchantable, nonconforming or inferior goods shipped to National.[16] For such goods to be merchantable, they were required to:

(a) pass without objection in the trade under the contract description; . . .

. . .

(c) [be] fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved. . .

. . . .

11A V.I.C. § 2-314(1); *Federal Deposit Ins. Corp. v. Griffith*, 15 V.I. 351, 364 n.21 (Terr. Ct. 1978).[17] If goods do not meet these standards, they are inferior and violate the implied warranty of merchantability.

---

[15] *See* Brief for Appellant at 6.

[16] *Maduro v. Ford Motor Co.*, 10 V.I. 401, 407-10 (D.V.I. 1974).

[17] These are the only criteria involved here, although there are several other requirements which sometimes must be satisfied.

■ A great deal of evidence was presented on the merchantability and nonconformance of the goods shipped by Gulf Trading to National. There was testimony that "Chilean pine" might pass without objection for "pitch pine" and that doors of a different color than the doors ordered might pass in certain situations, but that warped plywood and doors of a different size than needed could not pass without objection. Likewise, there was evidence that warped plywood and doors larger or smaller than those ordered would not be fit for the ordinary purposes for which the goods are used. The record supports a finding that the kind, quality, and quantity of much of the goods shipped by appellants were often different from what was ordered. For example, on one occasion, wood of a different kind, description, and size than ordered was delivered. Another time, doors of a different kind than requested were shipped. On still another occasion, doors of a different size than ordered were delivered. The court found from all this evidence that the merchantability of the goods under section 2-314(1) was not established, and consequently, many of the goods shipped by appellants to National violated the implied warranty of merchantability.

The next step in the U.C.C. analysis is to determine whether National, the buyer, did what was necessary to impose liability on appellant for this breach of the implied warranty. U.C.C. section 2-601 provides that a buyer who receives goods which do not conform to the contract may "(a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest."[18] A buyer may also reject goods which do not conform to the contract or revoke acceptance of goods already received if the nonconformity of the goods substantially impairs their value.[19] Rejection, however, must occur "within a reasonable time after their delivery or tender,"[20] and the seller must be "seasonably"

---

[18] 11A V.I.C. § 2-601.

[19] *T-Shirt World, Inc. v. Artland, Inc.* 20 V.I. 147, 150 (D.V.I. App. 1983) (citing 11A V.I.C. §§ 2-601, 2-608).

[20] "Reasonable time" is defined in section 1-204 as dependent upon "the nature, purpose and circumstances" of an action.

notified;[21] if the seller then does not give reasonably timely instructions after such seasonable notice of the buyer's rejection the goods, the buyer may store the rejected goods for the seller's account and be reimbursed as provided in section 2-603.

■ The U.C.C. provides that acceptance occurs when, after a "reasonable opportunity to inspect the goods," (1) the buyer finds that the goods are conforming or decides to retain the goods in spite of their non-conformity, (2) fails to make an effective rejection, or (3) does any act inconsistent with the seller's ownership.[22] In this case, National had a "reasonable opportunity to inspect the goods," but failed to reject the goods even though they did not conform to the orders. National's failure to effectively reject the goods constituted acceptance. As expressly provided in section 2-607,

> [a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it unless the acceptance was [based] on the reasonable assumption that the non-conformity would be seasonably cured . . . .

The Territorial Court Judge here concluded that, while National intended to reject the goods, it was persuaded otherwise by Gulf Trading's representative.[23] Thus, National's behavior was inconsistent with it's intent to reject the inferior or non-conforming goods.

■■ Even if, as appellee contends, the resulting contractual relationship between appellant and appellee was one of consignment, otherwise known in U.C.C. terms as a "sale or return" contract, it was still governed by the U.C.C. provisions regarding defective or non-conforming goods. Though it was excused from paying for the delivery until the goods were sold, National

---

[21] 11A V.I.C. § 2-602(1). "An action is taken 'seasonably' when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time." 11A V.I.C. § 1-204(3).

[22] 11A V.I.C. § 2-606(1).

[23] App. Part II, p. 60-61; 190 (the court found that "Mr. Murray, to put it simply, made a bad deal in the very beginning. Because one is induced by sales talk to purchase items, does not in and of itself amount to fraud.").

retained all the goods and did not revoke its acceptance and return the defective goods to Gulf Trading. From the legal as distinguished from the equitable perspective, then, National was obligated to pay Gulf Trading for even the defective and nonconforming materials, since it accepted all the goods and did not revoke that acceptance and return the defective merchandise.[24]

■ ■ Nevertheless, every contract or duty within the U.C.C. "imposes an obligation of good faith in its performance or enforcement,"[25] which is further defined for a merchant to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."[26] In an effort to prove its counterclaim for fraud and misrepresentation,[27] National presented evidence of Gulf Trading's lack of good faith in, among other things, using it as a "dumping receptacle" for unmarketable products. While appellee's evidence of bad faith may not have been sufficient to allow the trial judge to find appellants liable for misrepresentation, National did establish Gulf Trading's bad faith and lack of fair dealing in taking advantage of Murray's business naivety. With assurances not to worry; "if you don't sell the goods, you don't have to pay," Gulf Trading's representative repeatedly lulled National's repre-

---

[24] Section 2-327 provides in pertinent part:

(2) Under a sale or return unless otherwise agreed
  (a) the option to return extends to . . . the goods while in substantially their original condition, but must be exercised seasonably; and
  (b) the return is at the buyer's risk and expense.

11A V.I.C. § 2-327 (2). Uniform Law Comment 2 provides that the return procedure due to defects is governed by "the provisions on the effects and revocation of acceptance."

[25] 11A V.I.C. § 1-203. *See U & W Indus. Supply, Inc. v. Martin Marietta Alumina, Inc.*, 30 V.I. 460, 469, 34 F.3d 180, 185 (3d Cir. 1994)(citing *Skeels v. Universal C.I.T. Credit Corp.*, 335 F.2d 846, 851 (3d Cir. 1964)) (noting that section 1-203 imposes "a general requirement of fundamental integrity in commercial transactions"); *Action Eng'g v. Martin Marietta Aluminum*, 670 F.2d 456, 460 n.8 (3d Cir. 1982)(requiring each party to act in good faith and fair dealing).

[26] 11A V.I.C. § 2-103(1)(b) (defining "good faith"). *See* Restatement (Second ) of Contracts § 205 cmt. a (1981), applicable in the Virgin Islands pursuant to 1 V.I.C. § 4. Moreover, Uniform Laws Comment 4 to 11A V.I.C. § 2-327 specifies that the provisions of this section and the contract "must be read with commercial reason and with full attention to good faith."

[27] Principles of equity, including the law relative to fraud and misrepresentation, supplement the U.C.C. unless displaced by a particular provision of the Code. 11A V.I.C. § 1-103.

sentative into giving up National's right to reject the defective merchandise. Despite promises from de la Torres that he would discuss the situation with his superior and "take care of it," it was never taken care of. Even when Gulf Trading finally agreed at Murray's insistence to send a representative to St. Croix to examine the defective goods, appellant continued to deal unfairly by sending a representative when it had been advised and knew full well that Murray was not on island. Moreover, appellant's representative allowed only a very short time and made no effort to look at, much less examine, the defective and nonconforming goods.

Thus, even though National did not reject the defective and nonconforming goods, the judge found that the goods were not merchantable and exercised the court's equitable power in light of appellants' bad faith and lack of fair dealing to grant National an offset against the total due. It is clear to this Court, as it was clear to the trial court, that appellants repeatedly acted without good faith and did not deal fairly in the conduct of their business with National. We conclude that the Territorial Court's reasoning and decision was correct.

## CONCLUSION

Although National never effectively rejected the goods, an offset on the basis of equity was warranted because of the showing of bad faith and lack of fair dealing on the part of appellants. The judgment of the Territorial Court is affirmed. An appropriate order follows.

## ORDER OF THE COURT

AND NOW, this 24th day of January, 1996, having considered the submissions and arguments of the parties; and for the reasons set forth in the Court's accompanying Memorandum of even date;

IT IS ORDERED AND ADJUDGED that the judgment of the Territorial Court is AFFIRMED.