**VERONICA PHILLIPS, Appellant**
**v.**
**RUPERTHA ANDREWS, Appellee**

PHILLIPS v. ANDREWS

D.C. Civ. App. No. 2000/096

District Court of the Virgin Islands

Division of St. Croix

August 17, 2004

*For Appellant*: ALLAN A. CHRISTIAN, ESQ., St. Croix, U.S.V.I.

*For Appellee*: RHONDA HOSPEDALES, ESQ.

FINCH, *Chief Judge, District Court of the Virgin Islands*; MOORE, *Judge of the District Court of the Virgin Islands*; and HODGE, *Judge of the Territorial Court, Sitting by Designation*

## MEMORANDUM OPINION

(August 17, 2004)

Veronica Phillips ["Phillips", "appellant"] appeals from a June 14, 2000 decision of the Territorial Court denying her request for damages following a bench trial. Phillips asks this Court to review the Territorial Court's determination that she orally authorized the appellee to spend her insurance proceeds on her behalf. We hold the oral agreement was contemporaneously made with the written power of attorney and, therefore, cannot be offered to modify the authority contained in the writing. Accordingly, the trial court's determination will be reversed.

# I. STATEMENT OF FACTS AND PROCEDURAL POSTURE

## Powers of Attorney

In 1995 Phillips, who at the time resided in New York, engaged real estate broker Rupertha Andrews ["Andrews", "appellee"] to assist her in the purchase of a home on St. Croix. [Appendix of Appellant ("App.") at 160-68]. In May or June of 1995, Phillips entered into a contract for the purchase of a home at No. 230 Estate La Grange, Frederiksted. Phillips subsequently executed a special power of attorney authorizing Andrews to act on her behalf to complete the real estate closing. That power of attorney was executed on June 1, 1995 and was to be effective until closing.[1] [App. at 10-11]. The real estate closing was scheduled for December 22, 1995. Prior to the scheduled closing, a hurricane struck St. Croix, causing damage to the La Grange home. Nonetheless, Phillips agreed to proceed with closing on December 22, 1995, with the condition that the seller turn over any insurance proceeds collected for necessary repairs. [*See* Ct.'s Mem. Op. and Order, App. at 161]. Following closing on December 22, 1995—which Phillips apparently attended on St. Croix—Phillips executed a second power of attorney on December 29, 1995 authorizing Andrews to *receive* the insurance proceeds on her behalf. [App. at 13-14]. Phillips asserts that was where Andrews' authority ended. However, Andrews maintained at trial that, around the same time period as the written power of attorney, Phillips gave her an additional oral grant of authority to *expend* the insurance proceeds for the purpose of securing repairs to Phillips' home. [App. at 43, 146-59]. The only time reference appearing in the record for this purported oral grant of authority was sometime around "the ending of 1995" while Phillips was on St. Croix for the real estate closing. [App. at 35, *see also* App. at 37, 159-24-159-31].

## Dispute Over Agent's Authority

Phillips disputes she ever orally extended Andrews' authority. Rather, she testified she authorized Andrews only to receive the insurance proceeds on her behalf, as outlined in the written power, and asserts that

---

[1] The trial court raised concerns regarding Andrews's representation of both the seller and buyer in this transaction, which is prohibited by title 27, section 422-51(k), (m) of the Virgin Islands Code. However, the court noted that violation did not affect the outcome of this case.

she expected Andrews to simply send the proceeds to her in New York. [App. at 159]. Phillips further testified she was unaware that the insurance settlement had finally been made on January 22, 1996, or the amount of that settlement, until inquiring about the check at the end of March, 1996. [App. at 159-5-159-7, 35]. By then, the proceeds had already been fully depleted. Andrews' testimony and her letter to Phillips dated April 4, 1996 in response to the parties' March, 1996 telephone conversation appear to support Phillips' assertion that she had not been made aware an insurance check had been issued and had, accordingly, inquired about the whereabouts of the insurance settlement in March, 1996. In that letter, Andrews stated in part:

> As per our telephone conversation regarding your insurance proceeds, as I told you verbally, I did exactly what Janet instructed me to do. I had no reason to doubt Janet's request, especially when I was not present when the repairs estimate was given. As I have mentioned before, I followed instructions as requested of me by Janet to "DEPOSIT YOUR INSURANCE CHECK, FOR REPAIRS TO YOUR PROPERTY IN MY ACCOUNT AND THEN GIVEN ALL OF THE MONEY TO MR. ARCHIBALD IN ORDER FOR HIM TO DO THE REPAIRS." So that is what was done. However, attached you will find a copy of the settlement check for repairs to your property at 230 La Grange, Frederiksted, St. Croix, V.I., in the amount of $14,081.75 ...

[App. at 22] (emphasis in original). Along with that letter, Andrews also forwarded a copy of the settlement check to Phillips. [Id.]. That letter also appears to include an admission from Andrews that she had distributed the funds based on the instructions of Janet Davis, rather than from Phillips. [Id.]. Davis, however, testified she gave Andrews no such authority. [App. at 97-98]. Notwithstanding what appears to be a clear documentary admission by Andrews that she had distributed the insurance proceeds based on instructions from Janet Davis,[2] rather than on Phillips' authority, the trial court found there was proper authorization. The trial court apparently credited Andrews' explanation at trial that the instruction from Janet Davis was actually in addition to prior authorization given by Phillips and simply "reaffirmed" what

---

[2] Janet Davis was Phillips' friend who also worked briefly in Andrews' office.

237

Phillips had previously told her to do. [See App. at 40; *see also* Ct's Op'n and Order, App. at 164].

Andrews conceded she had a telephone conversation with Phillips in March, 1996 but said Phillips called her only to inquire about the status of *repairs* to the home. [App. at 35]. Inexplicably, Andrews testified that in response to that inquiry regarding the status of repairs, she told Phillips: "I explained to her that the insurance proceeds, it came more than she anticipated and I did what she asked me to do. I gave it to Wrigby Archibald to do the repairs on her house." [*Id.*]. Andrews said she then followed up that telephone conversation with the aforementioned letter regarding the status of the insurance proceeds. [App. at 22, 38]. Although there was testimony the repairs to the home were done between January and June, 1996, the insurance proceeds were fully depleted by March 25, 1996. [App. at 22, 104]. In her April 4, 1996 letter to Phillips, Andrews outlined the disbursements to Archibald totaling $14,081.75 as follows:

| | |
|---|---|
| Feb. 29, 1996 | $2,500 |
| March 6, 1996 | $3,000 |
| March 12, 1996 | $2,500 |
| March 15, 1996 | $600 |
| March 22, 1996 | $2,500 |
| March 22, 1996 | $500 |
| March 25, 1996 | $2,481.75 |

[App. at 15-22, 78]. That summary provided no indication as to the specific purpose of those payments.

## Phillips-Archibald Agreement to Repair

Notwithstanding the agency created permitting Andrews to represent Phillips' interest at the real estate closing, it appears from the record that Phillips, indeed, was present on St. Croix for that closing on December 22, 1995. [*Id.* at 37, 159-24]. Andrews testified that while Phillips was on St. Croix for that closing, Andrews introduced her brother, Wrigby Archibald ["Archibald"], to Phillips. [App. at 56-59, 106]. Archibald, a contractor, testified Phillips asked him to take a look at the house to assess the damage, and he accompanied a bank officer and insurance adjuster to the house to aid in securing an insurance settlement.

238

Thereafter, an insurance settlement amount of $14,081.75, which Archibald testified was still insufficient to do the needed repairs, was issued. Archibald further testified that Phillips asked him to repair the house and told him he would be paid by Andrews. [App. at 86]. He concedes he never prepared an estimate, never agreed on a price for the repairs, and never entered into an agreement with Phillips because he did not intend to do a "contract job" for her at a "fixed price." [App. at 63]. Rather, he said he merely intended "to go along with and help her with what she have to do(sic)." [App. at 63, 65]. Archibald conceded this was not the regular practice he followed as a contractor for 25-30 years:

Q: Is it your practice to estimate from your head the cost of repairing of buildings that you are going to repair?

A: Yes, that what you have to do most of the time.

Q: You don't put it in writing?

A: Yes, sir, we do. But I explain to you again that this was a different situation here.

Q: What was the difference?

A: Because I wasn't out there doing a job for her, to get a job to do for her. I was just assisting her with getting out there with the adjusters so the work that the adjusters didn't see before, to bring them aware of it and what it would cost.

[App. at 65-66]. Archibald contends, however, that he completed repairs to the home, which he described as follows:

> I had some fellas working there. And what we do, we had the Heavy-Christian Heavy Equipment clean the entire lot, the half acre or more. And the driveway was not usable after the storm and then we make it usable with the machine; clear the entire lot and make the driveway usable; and paint the house. Repair the sheet rock, do the roof, do the electrical work, put fans, tile the porch, clean the cistern, paint the porch, replace the gutters, refasten the roofs, paint the porch floors, the front floor porch, redecorate the lattice that was on there, and plumbing. Some plumbing was done too. (sic).

[*Id.* at 86-87; 68]. Archibald testified he never billed Phillips for any of the work done. [*Id.*]. Moreover, he asserted he did not know what the repairs actually cost and could produce no receipts evidencing the repairs made because, he said, his son had sold the truck in which those records

were kept. [App. at 67-68]. Andrews similarly could not testify to the cost of any repairs, but she asserted she gave all of the insurance proceeds to Archibald and that the repairs exceeded the amount of those funds. [App. at 37, 42-43]. Andrews claimed Phillips was billed for a deficiency amount to cover the repairs; however, that testimony was contradicted by both Archibald and Phillips, who asserted no bill was ever submitted to Phillips for the work done. [App. at 159-21, 149-50; App. at 87, 159-12]. Moreover, no bill was produced at trial. Davis also corroborated testimony that Archibald did some repairs to the home. [App. at 102-04].

Phillips asserted that while she talked to Archibald about repairs to the home, they arrived at no agreement for the completion of such repairs. [*See* App. at 66; Br. of Appellant at 7]. She asserted she could not have made such an agreement at that juncture, without the benefit of any information regarding its probable cost and without knowing the amount of insurance proceeds she would receive. [App. at 159]. Phillips also refuted witnesses' testimony that repairs were done and asserted that upon her return to St. Croix later that year she found the home in the same condition in which she had left it. [App. at 159-9]. Phillips filed the underlying action for debt in December, 1996.

### Finding of Authority

After considering the evidence at trial, the court denied Phillips' requested relief, finding that while the written power of attorney of December 29, 1995 did not address Andrews' authority to apply the insurance proceeds to repair the home, there was an oral grant of such authority. The court made the following findings which it said supported that conclusion:

> Phillips never contacted Andrews to inquire why the check was not sent to her in New York, that Phillips did not refute the abundant evidence showing that she spoke with Archibald about the necessary repairs and that Phillips did not present any evidence, other than her own conclusory testimony, depicting the condition of the home. Such circumstances lead the Court to find that Phillips did not immediately inquire as to the whereabouts of the check because she had previously retained Archibald to repair the damage and authorized Andrews to pay for the repairs with the insurance proceeds.

[App. at 167-68]. This appeal followed.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

This Court has jurisdiction to consider this timely civil appeal, by virtue of title 4, section 33 of the Virgin Islands Code.[3] The court's application of legal precepts is subject to plenary review. *See Feddersen v. Feddersen*, 68 F. Supp. 2d 585, 598, 41 V.I. 230 (D.V.I. App. Div. 1999). However, factual determinations may be set aside only if found to be clearly erroneous. *Id.; see also, Coastal Gen. Constr. Servs. v. V.I. Hous. Auth.*, 238 F. Supp. 2d 707 (D.V.I. App. Div. 2002). Clear error may be found when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed, or where the trial court's determination is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *See Coastal*, 238 F. Supp. 2d 707; *Bloch v. Bloch*, 473 F.2d 1067, 1068-69, 9 V.I. 554 (3d Cir. 1973).

### B. Andrews' Authority to Expend Insurance Proceeds

No one disputes Andrews had authorization, pursuant to the December 29, 1995 written power of attorney, to *accept* Phillips' homeowner's insurance check on her behalf. Thus, the only issue before the Territorial Court was whether Andrews also had authority to disburse those proceeds to a third party.

### 1. Grant of Authority

The relationship between Phillips and Andrews is governed by the law of agency.[4] An agency relationship is formed by the

---

[3] *See* V.I. CODE ANN. tit. 4, § 33 (1997 & Supp. 2003); Revised Organic Act of 1954 § 23A, 48 U.S.C. § 1613a. The complete Revised Organic Act of 1954 is found at 48 U.S.C. § 1541- 1645 (1995 & Supp. 2003), *reprinted in* V.I. CODE ANN. 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

[4] While the underlying transaction and the purposes of the agency surrounded the La Grange property, the Statute of Frauds does not apply to these facts. The Virgin Islands Statute of Frauds requires a writing for agreements: transferring or otherwise affecting an interest in real property, for contracts for which performance is to exceed one year, for promises to answer for the debt or default of another, and for promises made in

"manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." RESTATEMENT (SECOND) OF AGENCY § 15 (1981).[5] Creating an agency relationship requires no formality. As the trial court correctly noted, an agent's authority may be created "by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Id.* at § 26 and cmt. c. However, this section must be read in concert with section 34 and related provisions which disfavor attempts to prove an oral grant of authority on the same subject matter contained in a written grant of authority. The restatements provide:

> Formal instruments which delineate the extent of authority, such as powers of attorney and contracts for the employment of important agents, either executed on printed forms or otherwise giving evidence of having been carefully drawn by skilled persons, can be assumed to spell out the intent of the principal accurately with a high degree of particularity ..., and it is assumed that the document represents the entire understanding of the parties.

*Id.* at § 34 cmt. h. Thus, where the agent's authority is conferred through a writing, the court must look to the form and content of that writing, in light of the circumstances, to ascertain whether the parties intended it to constitute a complete and final expression of their agreement. *Id.* § 48;

---

consideration of marriage. *See* § 28 V.I.C. 241-244. The agreements at issue here surround the scope of an agent's authority to act on behalf of the principal in accepting and disbursing funds for repairs to real property. However, the facts of the case raise no issues or disputes regarding interests in real property and are too attenuated from Phillips' purchase of the La Grange property to bring this case within the Statute of Frauds. *See e.g.,* 9 RICHARD A. LORD, WILLISTON ON CONTRACTS § 25:13 (4th ed. 2003) (noting that since statutes of frauds affect only the sale of any interest in land, contracts that relate to land but do not involve any agreement for its sale are not within such statutes); *cf. Roberts v. Ross,* 344 F.2d 747, 5 V.I. 219 (3d Cir. 1965) (noting the Virgin Islands Statutes of Frauds relate only to the *sale* or *conveyance* of land or the creation, transfer, surrender or declaration of interests in land; holding the statute inapplicable, therefore, to agreement for the payment or compensation of agents or brokers for effecting such real estate sale because such agreements do not deal with any interest in real estate but merely stipulate for personal services relating thereto), *criticized on other grounds, Lansford-Coaldale Joint Water Authority v. Tonolli Corp.,* 4 F.3d 1209 (3d Cir. 1993).

[5] The rules of the common law, as expressed in the restatements of the law, have been adopted as substantive law of the Virgin Islands in the absence of local law to the contrary. See 1 V.I.C. § 4.

*see also* § 34 (a)-(e) (noting the circumstances which may be considered, such as usage of trade and course of conduct). This inquiry is of some significance, because a writing intended as the entire understanding of the parties is then subject to the parol evidence rule which precludes consideration of extrinsic evidence of prior or contemporaneous agreements extending or altering the authority granted in a writing. *Id.* at cmt. b; *see also* RESTATEMENT OF CONTRACTS § 237 (1932). In this regard, the Restatement of Agency provides:

> If the agreement between principal and agent is integrated, evidence of contemporaneous oral agreements and of prior oral or written agreements contradicting or altering the tenor of the instrument is not relevant, and hence not admissible to prove the nature or extent of the authority, but evidence of the circumstances attending its making and of the other matters stated in Section 34 is relevant and therefore admissible ... Also admissible is evidence of subsequent agreements varying the tenor of the instrument, of facts showing acquiescence by the principal in conduct unauthorized by its terms, and of changes in circumstances which have the effect of broadening or narrowing the authority.

RESTATEMENT (SECOND) OF AGENCY § 48 cmt. b (emphasis added).

 Integration of an agreement need not be accomplished through a formal provision in the document but, rather, may be shown through the plain language[6] of the agreement evidencing an intent to have it represent the complete understanding of the parties or by the conduct of the parties pointing to their manifestation of intent to regard the writing as an integrated document. *See id; see also Mellon Bank Corp. v. First Union Real Estate Equity and Mortg. Investments*, 951 F.2d 1399, 1406 n.6 (3d Cir. 1991) (formal clause not required for finding of integration; the

---

[6] The court must give effect to the plain and unambiguous language of an agreement. An ambiguity exists where the challenged provision is reasonably susceptible of different meanings. *See e.g., Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3d Cir. 1980); *Gulf Trading Corp. v. National Enters.*, 912 F. Supp. 177, 179, 33 V.I. 129 (App. Div. 1996); *University of V.I. v. Petersen-Springer*, 232 F. Supp. 2d 462, 469-70 (D.V.I. App. Div. 2002). In determining whether a contract term is ambiguous, the Court may search outside the four corners of the agreement and look to the context of the transaction and its subject matter, common meanings of the challenged term, the relation of the parties, and the contract as a whole. *See e.g.,* RESTATEMENT § 212 cmt. b, § 202 cmt. e.

parties' intent controls). However, express language within an agreement that specifies the intent of the parties to limit their terms to the agreement must ultimately be given effect. *See* RESTATEMENT (SECOND) OF CONTRACTS § 212, cmt. b (1981) (the words of an integrated agreement remain the most important evidence of intention); *Tamarind Resort Assocs. v. Virgin Islands*, 138 F.3d 107, 110, 39 V.I. 485 (3d Cir. 1998); *cf. United States v. Clementon Sewerage Auth.*, 365 F.2d 609, 613 and n.1 (3d Cir. 1966) (If the writing contains a statement to the effect that it is the complete and final statement of the agreement, courts may give the statement conclusive effect in determining integration). Integration of a written agreement may also be shown by implication, where the writing specifies in detail the terms of the agreement, *see* RESTATEMENT (SECOND) OF CONTRACTS § 209(3), or where the contradictory written and oral agreements surround the same subject matter and are so closely related as to support the inference that "the contracting parties would normally have included both in one agreement." *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 995-96 (3d Cir. 1987). As this circuit has recognized:

> "If [both an oral and written agreement] relate to the same subject matter, and are so interrelated that both would be executed at the same time and in the same contract, the scope of the ... agreement must be taken to be covered by the writing."

*Mellon*, 951 F.2d at 1405 (citations omitted). Thus, the relevant inquiry in determining the effect of an oral agreement in the face of an inconsistent writing defining the scope of the agent's authority is whether the written power of attorney is to be regarded as the complete agreement between the parties, thus precluding admission of an inconsistent oral agreement on the same subject matter. This is a question of law, where its determination rests on the plain language of the agreement and does not rely on extrinsic evidence. *See Tamarind Resort*, 138 F.3d at 110) (relying on RESTATEMENT (SECOND) OF CONTRACTS § 212(2) (1981))[7];

---

[7] The RESTATEMENT provides:

A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.

*see also* RESTATEMENT (SECOND) OF CONTRACTS § 212 cmt. b; *Hershey Foods*, 828 F.2d at 995 (noting that whether a writing constitutes the final and complete expression of the parties' agreement is a determination to be made by the court as a matter of law); *see also Aetna Ins. Co. v. Newton*, 274 F. Supp. 566, 571 (D. Del. 1967) ("When a written contract is clear, its language is conclusively presumed to correctly express the intent of the parties and, in the absence of fraud or mistake, no parol suggestions to the contrary will be countenanced.").

In this instance, the principal executed a detailed, two-page power of attorney, which provided in pertinent part:

> My agent shall have full power and authority to act on my behalf but only to the extent permitted by this Special Power of Attorney. My Agent's powers shall include the power to:
>
> 1. Receive any and all insurance proceeds/interest of mine in real (sic) located at: plot No. 230 of Estate La Grange, West End Quarter, Frederiksted, St. Croix, V.I.

[App. at 13] (emphasis added).[8] The trial court found—and neither party disputed—that this written agreement granted Andrews limited authority to merely receive the insurance proceeds on her principal's behalf and did not grant authority to sign that check or to expend those proceeds. The court, therefore, credited a separate oral agreement on that issue. Implicit in that finding was a determination that the writing did not reflect the parties' full agreement with regard to the scope of Andrews' authority in the handling of the insurance check. To the extent the trial court discounted the specifically defined scope of authority and its express limitations in the written agreement and credited a separate oral agreement on the same subject matter, it committed error.

First, contrary to the trial court's finding, the written agreement clearly addressed the precise subject matter contested here: that is, the scope of the agent's authority with regard to the handling of Phillips' insurance settlement. The plain language of the written agreement significantly limited Andrews' authority in that regard by specifying the scope of her authority and by expressly limiting the agent's authority to

---

RESTATEMENT (SECOND) OF CONTRACTS § 212(2) (1981) (emphasis added).

[8] It was established at trial that Andrews prepared this agreement, as well as the previous one which was executed for the purpose of the real estate closing.

that defined in the writing. Moreover, the written grant of authority permitting the agent to accept the insurance proceeds on the principal's behalf and limiting the agent's authority accordingly is necessarily intertwined with any authority of the agent to expend those very proceeds. This Court also views with significance the close relationship in time between the two purported grants of authority. The written power of attorney was executed on December 29, 1995. Inexplicably, Andrews asserted that during the exact time frame (sometime toward the ending of December) that Phillips executed that writing expressly limiting her authority to *receipt* of the insurance check, Phillips also orally granted extended authority to Andrews to endorse that check and disburse its proceeds. Because the subjects of both agreements are so closely related and the relationship in time so close, the only reasonable inference is that one intending to so significantly enlarge the agent's authority would have done so in the writing specifically defining that authority.[9] We also cannot ignore the parties' prior course of conducting business and defining their agency relationship only through a writing, beginning first with Phillips' initial grant of authority for Andrews to represent her at the real estate closing and, following that closing and the expiration of the power of attorney related thereto, the execution of a second power of attorney authorizing Andrews to again act on her behalf with regards to the insurance settlement.

We therefore hold that, under these circumstances and in light of its express language, the written power of attorney unambiguously defined the full terms of the agency and expressly limited its scope and must, therefore, be viewed as the complete agreement between the parties on that issue. Thus, an inconsistent contemporaneous oral agreement cannot be offered to modify the authority defined in that writing. To do so would run counter to the purpose of the parole evidence rule, which is aimed at upholding the sanctity and predictability of written agreements, and would improperly permit the clearly established intent of the parties to be readily disregarded in favor of a broader oral agreement—with all the attendant problems in proving such oral agreements and in sifting through contradictory testimony. *See e.g.*, *Hershey*, 828 F.2d at 994; *Advanced Medical, Inc. v. Arden Medical Systems, Inc.*, 955

---

[9] It is apparent the trial court did not apply the parol evidence rule nor considered the effect of the contemporaneous nature of the agreements.

F.2d 188, 195 (3d Cir. 1992). For the foregoing reasons, we hold the trial court erred as a matter of law in giving legal effect to a contemporaneous oral agreement significantly expanding the scope of the agent's authority which was otherwise expressly defined in a writing.[10]

## 2. Scope of Authority

Alternatively, were we to uphold the court's determination that Andrews had authority to expend the insurance funds on Phillips' behalf, that would not end the inquiry where, as here, the principal disputes how those funds were used or whether she obtained the intended benefits. Rather, the relevant question then becomes whether the agent exceeded the scope of her authority through the issuance of checks for undetermined or undocumented purposes and in her failure to obtain receipts or to provide a full accounting of those funds.

An agent may act only within the scope of authority defined by the principal. *See* RESTATEMENT (SECOND) OF AGENCY §§ 383, 33. Moreover, an agent is held to a legal duty to use reasonable care and skill and to act in accordance with the "reasonable customs or, if there are no customs, that he is to use good faith and discretion" in exercising his authority. *Id.* at § 383 cmt. a; *see also*, § 379(2) (duty of care and skill); 377 cmt. b (noting agent's duty to make reasonable efforts to accomplish the directed result). Importantly, and more relevant here, where an agent's authority involves receiving and remitting funds, an agent has a legal duty to fully account to a principal for funds expended on his behalf. In that regard, the Restatement provides: "Unless otherwise agreed, an agent is subject to a duty to keep, and render to his principal, an account of money or other things which he has received or paid out on behalf of the principal." *Id.* at § 382.[11] The comments to the restatement outline the broad contours of this duty:

---

[10] Whether there was an agreement between Archibald and Phillips to repair the home is not a direct issue in this case, as this action is not against Archibald. At best, that issue could serve only to inform the question of Andrews' scope of authority, in the absence of an unambiguous written agreement to the contrary. However, because we conclude there was an unambiguous agreement outlining the full terms of the agency under these facts, we need not decide whether there was a separate agreement between Phillips and Archibald.

[11] This duty was also expressly noted in the December 29, 1995 power of attorney. [See App. at 13].

The agent's duty ordinarily includes not only the duty of stating to his principal the amount that is due, <u>but also a duty of keeping an accurate record of the persons involved, of the dates and amounts of things received, and of payments made. The agent has a duty to take such receipts as are customarily taken in business transactions</u>. His duty in these respects is satisfied if he acts reasonably in view of the business customs of the community and the nature of his employment.

*Id.* at cmt. a (emphasis added). Hence, an agent who accepts the authority to disburse funds on behalf of the principal for a particular purpose necessarily assumes the duty to account for the purposes of such disbursements and to ensure the principal receives the intended benefit of those disbursements. *See id.; see also* 3 AM. JUR. *Agency* § 217 ("An agent must apply agency funds or property for the purposes of the agency."). Additionally, once it is proved an agent held funds for a principal, it is the agent's burden to prove those funds were properly put to their intended purpose. *See* RESTATEMENT § 382 cmt. e; *cf. Dresden v. Willock*, 518 F.2d 281, 290, 12 V.I. 179 (3d Cir. 1975) (burden of proof as to the propriety of expenditures on a principal's behalf lies with the agent).[12]

 Therefore, even if the purported oral grant of authority was properly given effect—and we do not hold that it was—that agreement would have authorized Andrews only to disburse funds for the limited purpose of securing repairs to Phillips' home. Given the duties of an agent imposed by law, mere proof that Andrews disbursed all of the insurance proceeds to Archibald is insufficient to satisfy the standards noted above. Rather, implicit in that limited grant of authority was a requirement that Andrews also maintain a record of the purposes of each disbursement by requiring, at minimum, the submission of receipts from Archibald evidencing services rendered and any other steps customarily taken in similar construction transactions. This duty also required Andrews to specifically inform Phillips of the purposes for which the payments were made. This was not established at trial. The checks

---

[12] Inconsistent with the agent's burden in this regard, the trial court found Phillips had failed to adduce evidence showing the current condition of her home, apparently to disprove testimony that the insurance proceeds were applied to make repairs. However, it was not Phillips' burden to prove the absence of repairs; rather, it was Andrews' burden to produce receipts or other evidence establishing the purposes to which the principal's money was put.

submitted on the record did not inform the inquiry whether the funds were spent for the intended purpose of the agency. Indeed, the record offers little to inform the principal of the benefits she received for the funds paid by her agent. Notably, some of those checks were written to Archibald and others merely to "Cash." [App. 15-21]. Additionally, the notations on six of the seven checks issued indicated they were for the purpose of "Check Exchange(s)" and provided no clear indication that they were issued for Phillips' benefit. [*Id.* at 15-21].[13] Some of those checks were also endorsed by Andrews' son and a staff member in her office; there was some testimony that Andrews' children often assisted Archibald with his banking. [*Id.; see also,* App. at 84-85]. Archibald, however, did not testify regarding the checks written to "Cash", as the trial court did not permit him to be questioned regarding checks on which he was not listed as the payee. [App. at 72-73]. While none of these facts, standing alone, may have independent significance, they become more so in the context of the other evidence at trial. Significantly, the agent offered no evidence of the amount of money actually expended for Phillips' benefit. Andrews also collected no receipts, despite remitting $14,000 plus dollars to a third party. There was never any cost estimate prepared to advise Phillips—or Andrews, for that matter—of the expected expenditures and no invoice submitted to notify Phillips of any monies expended on her behalf and the benefits received. Indeed, neither Archibald nor Andrews could even testify to the cost of repairs or the amount of funds actually spent for that purpose. Therefore, there was little to guide the determination that Andrews acted within the scope of her authority in applying the insurance funds to the specific purposes intended.

### III. CONCLUSION

Having determined the grant of authority outlined in a written power of attorney did not address the agent's authority to disburse the insurance proceeds, the court looked to a contemporaneous oral grant of authority for that purpose. In doing so, the trial court discounted the express terms of the writing and the limited authority granted therein and gave full effect to an inconsistent oral agreement entered into at or around the

---

[13] We note that two of the checks containing that notation also included a reference to No. 230 Estate La Grange.

same time. The court's recognition of a contemporaneous oral agreement, in the face of a more limited written grant of authority, constituted reversible error under the circumstances present here. Because the written agency agreement between the parties imposed clearly defined limits on the agent's scope of authority in the handling of the principal's insurance settlement and limited the agency relationship by its express terms, a contemporaneous oral agreement could not be offered to prove an extension of the agent's authority. The court's judgment will be vacated and the matter remanded for further consideration.